[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 16-10128

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ERICKSON MEKO CAMPBELL,

Defendant- Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 3:14-cr-00046-CAR-CHW-1

_____

Before WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, BRASHER, and TJOFLAT,* Circuit Judges.

TJOFLAT, Circuit Judge, delivered the opinion of the Court, in which WILLIAM PRYOR, Chief Judge, BRANCH, GRANT, LUCK, LAGOA, and BRASHER, Circuit Judges, joined.

WILLIAM PRYOR, Chief Judge, filed a concurring opinion.

NEWSOM and JORDAN, Circuit Judges, filed a dissenting opinion, in which WILSON, ROSENBAUM, and JILL PRYOR, Circuit Judges, joined.

TJOFLAT, Circuit Judge:

Generally, issues that are not raised in a party's brief on appeal are considered abandoned. But that rule is not ironclad, and we may exercise our discretion to consider issues not raised by the parties on appeal. Erickson Meko Campbell appeals the District Court's denial of his motion to suppress evidence he claims was obtained in violation of the Fourth Amendment. Before the panel, both Campbell and the Government argued about whether a Fourth Amendment violation occurred. However, neither addressed whether the good-faith exception to the exclusionary rule would allow the suppression of that evidence even if a Fourth Amendment violation did occur. We asked the parties in our *en*

---

* Senior Circuit Judge Gerald B. Tjoflat elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

banc briefing notice the following question: "Is the good-faith exception to the exclusionary rule a proper ground for affirming Campbell's conviction despite the government's failure to raise that alternative ground before the panel?"  We conclude that we have the power to reach the good-faith exception in this case and exercise our discretion to do so.  We also conclude that the good-faith exception applies in this case.  Accordingly, we affirm the denial of Campbell's motion to suppress.

## I.

### A.

On the cool night of December 12, 2013, Greene County Deputy Sheriff Robert McCannon was patrolling Interstate 20 in Georgia.  Around 9:00 PM that evening, McCannon saw a grey Nissan Maxima cross the fog line—the line on the side of the highway that separates the roadway from the shoulder.  So, McCannon activated the camera on the dashboard of his police cruiser and began following the Maxima.  After observing the Maxima cross the fog line a second time and noticing that its rear left turn signal blinked at an unusually quick pace, he pulled the car over.  At that point, McCannon approached the Maxima from the passenger's side, asked the driver—Erickson Campbell—for his driver's license, and explained why he pulled him over.  McCannon stated that he stopped Campbell for failing to maintain his lane and for the apparent turn signal issue.  At McCannon's request, Campbell activated his left turn signal, which again flashed rapidly, and his front signal lights.  McCannon informed Campbell that he most likely had a

bulb out, and the two had a short conversation about the cause of the blinker problem.

After determining that the Maxima's left turn signal was malfunctioning, McCannon decided to issue Campbell a warning—but not a full-on ticket—for failing to comply with two Georgia traffic regulations: failure to maintain signal lights in good working condition[1] and failure to stay within the driving lane.[2] McCannon then asked Campbell to step out of the Maxima and

---

[1] O.C.G.A. § 40–8–26 states, in relevant part:

> (a) Any motor vehicle may be equipped . . . with the following signal lights or devices:
>
>> . . . .
>>
>> (2) A light or lights or mechanical signal device capable of clearly indicating any intention to turn either to the right or to the left and which shall be visible from both the front and the rear.
>
> (b) Every . . . signal light or lights indicating intention to turn shall be visible and understandable during daytime and nighttime from a distance of 300 feet from both the front and the rear. . . . [S]uch light or lights shall at all times be maintained in good working condition.

[2] O.C.G.A. § 40–6–48 states, in relevant part:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this Code section, shall apply:
>
>> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety[.]

accompany him to the patrol car while he wrote the citation. As he wrote up the warning, McCannon requested that dispatch run a check on Campbell's license. At the same time, he struck up a conversation with Campbell. He learned where Campbell worked, that Campbell was en route to Augusta to see his family, that Campbell had been arrested sixteen years ago for a DUI, and that Campbell was not traveling with a firearm. Then, McCannon asked Campbell if he had any counterfeit CDs or DVDs, illegal alcohol, marijuana, cocaine, methamphetamine, heroin, ecstasy, or dead bodies in his car. This second set of questions took about twenty-five seconds, and Campbell either shook his head or answered no in response to each inquiry. At that point, McCannon asked Campbell if he could search his car for any of those items, and Campbell consented.

While McCannon kept writing the warning, Sergeant Patrick Paquette—who had arrived on scene a few minutes earlier—began searching Campbell's car. McCannon then finished writing up the citation, had Campbell sign it, and joined Paquette in the search. The officers found a 9mm semi-automatic pistol, 9mm ammunition, a black stocking cap, and a camouflage face mask in a bag hidden under the carpet in the Maxima's trunk. Once confronted about the contents of his trunk, Campbell admitted that he lied about not traveling with a firearm because he was a convicted felon. So, Campbell was arrested.

*B.*

On August 13, 2014, a grand jury indicted Campbell for possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). A few months later, Campbell filed a motion to suppress claiming that the evidence found in the search of his car was obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. Campbell first contended that the seizure was unreasonable because McCannon lacked reasonable suspicion to believe that a traffic violation had occurred. The rapidly blinking turn signal, Campbell argued, did not supply reasonable suspicion to make the traffic stop. In Campbell's view, all that O.C.G.A. § 40–8–26 requires is that the turn signal "indicat[e] a driver's intention to change lanes," and the Maxima's left turn signal was able to do that. That the signal did not blink as designed was irrelevant, Campbell said, because the statute did not require that a turn signal "(1) blink in unison with the other turn signal, (2) blink at a certain pace, or even, (3) blink as intended by the vehicle manufacturer."

But even if there was reasonable suspicion, Campbell argued that the seizure was nevertheless unreasonable because McCannon prolonged the stop by asking questions unrelated to the purpose of the stop. Specifically, he challenged questions on the following topics:

> McCannon asked . . . : (1) where [Campbell] was going, (2) who he was going to see, (3) where he worked, (4) if he had time off work, (5) when his last traffic ticket was, (6) if he had ever been arrested, (7)

16-10128          Opinion of the Court                7

how old his car was, (8) how good of [a] deal he got
on his car, (9) whether he had any counterfeit mer-
chandise in the car, and, (10) if he had a dead body in
the car.

Relying on the Supreme Court's decision in *Rodriguez v. United
States*, 575 U.S. 348, 135 S. Ct. 1609 (2015), Campbell maintained
that if McCannon prolonged the stop at all through these inquiries,
the stop became unlawful. And if the seizure was an unreasonable
seizure, Campbell concluded, any consent he had given the officers
to search his car was tainted, requiring that the evidence uncovered
during the search be suppressed.

The District Court held an evidentiary hearing on Camp-
bell's motion to suppress in May 2015. McCannon—whom the
Government called to the stand—was the lone witness. Aside from
his testimony, the Court had the benefit of the video created by
McCannon's dashboard camera. The video portrays what tran-
spired between McCannon's activation of the camera and Camp-
bell's arrest, including the questioning Campbell complains of as
unrelated to the purpose of the stop:

**0:00:** McCannon activates the camera.

**2:05–16:** McCannon provides the Sheriff's Office dis-
patcher with the car's license plate number. The dis-
patcher runs the number and informs him that it be-
longs to Erickson Campbell, an "active felon."

**2:31:** McCannon activates his patrol car's flashing lights.

**2:36–58:** Campbell pulls over.

**3:25–32:** McCannon approaches the car from the passenger side and requests Campbell's driver's license.

**3:34–4:42:** McCannon explains to Campbell that he stopped him for "weaving in [his] lane" and because his left turn signal was blinking rapidly.  McCannon says the rapid blinking means "you've got a bulb out somewhere."  He then checks the lights in the front and back of the car, none of which are out.  McCannon says it must be that the turn signal is "starting to go bad," but that he won't write a ticket for that—just a warning.

**4:43–5:09:** McCannon asks Campbell where he is going.  Campbell says he is traveling to Augusta, Georgia.  McCannon asks why he is going there, and Campbell responds that he is going to see his family.

**5:10–13:** McCannon asks Campbell to step out of the car and walk with him to the patrol car where he will write the warning.

**5:48:** McCannon begins writing the warning.

**6:02–10:** Campbell asks McCannon about the weather, and the two discuss a rainstorm from the previous week.

**6:13–29:** McCannon asks Campbell about his family in Augusta, adding that he knows a little about Augusta. Campbell says he does not know much about Augusta; he just has family there. McCannon continues writing the warning.

**6:30–57:** McCannon asks Campbell what type of work he does. Campbell says that he works for American Woodlawn, building for Home Depot and Lowes. McCannon continues to write the citation.

**7:07–27:** McCannon asks Campbell where his family lives in Augusta. Campbell responds that his family lives off of Watson Road. McCannon indicates he knows approximately where that is; he continues writing the citation.

**7:48–8:30:** McCannon stops writing to retrieve his jacket from the patrol car.

**8:32–38:** McCannon asks Campbell if he is traveling with a firearm. Campbell shakes his head no.

**9:07:** McCannon acknowledges Sergeant Paquette, who has just arrived off camera.[3]

---

[3] Sergeant Paquette had observed McCannon's encounter with Campbell while patrolling the highway and had pulled over to assist.

**9:12–18:** McCannon asks Paquette to "come here and let me ask you about this location." McCannon tells Campbell that Paquette is from Augusta.

**9:31–39:** McCannon calls the dispatcher to run a check on Campbell's driver's license.

**9:40–54:** McCannon asks Campbell if he had been arrested before. Campbell responds yes, about sixteen years ago, for a DUI.

**10:00–56:** McCannon and Paquette ask Campbell about his destination and where his family lives in Augusta, while McCannon continues to intermittently write the warning.

**11:16–19:** McCannon: "I know I asked you if you have any firearms tonight, and you said 'no.'" Campbell nods and says, "Yes, sir."

**11:20–45:** McCannon: "Any counterfeit merchandise that you're taking to your relatives in Augusta? And what I mean by that is—any purses? Shoes? Shirts? Any counterfeit or bootleg CDs or DVDs? Anything like that? Any illegal alcohol? Any marijuana? Any cocaine? Methamphetamine? Any heroin? Any ecstasy? Nothing like that? You don't have any dead bodies in your car?" Campbell shakes his head or otherwise responds in the negative to each question.

**11:47–55:** McCannon: "I know you said you didn't have that, and I'm not accusing you of anything—can

I search it?  Can I search your car for any of those items I asked you about?"  Campbell responds in the affirmative, nodding and gesturing toward the car.

**12:02–13:05:** Paquette pats down Campbell after McCannon indicates that he had not yet done so. McCannon continues writing the warning.

**13:06:** Paquette begins searching the car.

**13:22–44:** McCannon asks Campbell to sign the citation.  Campbell does so and returns it to McCannon.

**14:00:** McCannon hands the citation to Campbell.

**16:18–19:58:** McCannon and Paquette search the car.

**19:58–20:08:** Paquette informs McCannon that he has discovered a gun and a ski mask.

**20:30–21:02:** The officers finish searching the car and place Campbell in handcuffs.

**21:25–40:** McCannon informs Campbell of his *Miranda* rights.

**24:12–48:** McCannon tells Campbell he is under arrest for felon in possession of a firearm.  McCannon places Campbell in the rear of his patrol car to be taken to the Greene County jail.

From the time McCannon began writing the warning ticket to Campbell's consent to the search, a total of six minutes and

seven seconds elapsed.  Campbell consented eight minutes and fifty-seven seconds after McCannon made the stop.  And the unrelated questioning of which Campbell complains lasted approximately twenty-five seconds.

## C.

At the conclusion of the evidentiary hearing, the District Court asked the parties for supplemental briefing to address the possible application of the Supreme Court's *Rodriguez* decision. The District Court also requested supplemental briefing on the applicability of *Davis v. United States*, in which the Supreme Court held that the Fourth Amendment's exclusionary rule should not apply when the police act in good-faith reliance on binding appellate precedent.  564 U.S. 229, 232, 131 S. Ct. 2419, 2423–24 (2011). After briefing from both parties on the *Rodriguez* and good-faith exception issues, the Court denied Campbell's motion to suppress

To start, the District Court determined that Campbell's rapidly blinking turn signal provided reasonable suspicion to stop the Maxima.  Georgia's statute requires that turn signals be in good working condition, and the Court reasoned that McCannon had reasonable suspicion to believe the rapidly blinking turn signal violated this requirement.  The Court likewise concluded that McCannon had "reasonable suspicion to initiate the stop to determine whether the front signal lights were functioning properly."  These findings were based largely on McCannon's testimony that he had changed "a couple hundred bulbs on [his] personal vehicles, on [his] patrol cars, [and] other people's cars," so he had "a pretty good

knowledge of the bulbs when they go out." And given its conclusion that the turn signal provided reasonable suspicion, the Court declined to address the failure-to-maintain-lane violation.

The District Court then turned to the prolongation issue. On that point, the Court found that McCannon was entitled to ask Campbell about his destination and the purpose of his trip; the year his car was made; the last traffic citation he received; his criminal history;[4] and whether he was traveling with a firearm. As the District Court put it, these questions "either addressed the traffic violation or were related to legitimate safety concerns."

But the questions about contraband, the Court said, were unrelated to the purpose of the stop. These questions—about counterfeit merchandise, drugs, and dead bodies—and Campbell's responses, consumed all of twenty-five seconds. And immediately following these questions, Campbell consented to the search of the Maxima. The Court said that those few seconds "McCannon took to ask a few unrelated questions 'did not transform the stop into an unconstitutionally prolonged seizure.'" The Court concluded that the overall length of the stop was reasonable and that McCannon conducted the stop "expeditiously." In doing so, the Court cited to and ostensibly relied on *Rodriguez*, but actually applied the rationale we used in *United States v. Griffin*, 696 F.3d 1354, 1362

---

[4] Citing *United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir. 2001), the District Court held that McCannon "lawfully asked Defendant about his criminal history while he waited on dispatch to run [Defendant's] license information."

(11th Cir. 2012), after holding that *Rodriguez* did not alter the test we established in *Griffin*. Because the seizure was reasonable, exclusion was unavailable and there was no reason for the Court to decide whether Campbell's consent was tainted or whether—as the Government argued in its supplemental briefing—the good-faith exception to the exclusionary rule applied. Following the District Court's ruling, Campbell entered a conditional guilty plea, preserving the right to appeal the denial of his motion to suppress. *See* Fed. R. Crim. P. 11(a)(2).

Campbell appealed and argued that his traffic stop was unlawful at its inception and unlawfully prolonged under *Rodriguez*. After oral argument, a panel of this Court affirmed the denial of the motion to suppress. *United States v. Campbell*, 912 F.3d 1340 (11th Cir. 2019). But we withheld the mandate and the panel *sua sponte* issued a revised opinion, once again affirming. *United States v. Campbell*, 970 F.3d 1342 (11th Cir. 2020). In both opinions, the panel considered the application of the good-faith exception—which was fully briefed in the District Court—despite the Government's failure to address the matter on appeal. We then granted Campbell's petition for rehearing *en banc* and vacated the panel's amended opinion. *United States v. Campbell*, 981 F.3d 1014 (11th Cir. 2020). In our *en banc* briefing notice to the parties, we asked counsel to focus their briefs on whether we may affirm based on the good-faith exception despite the Government's failure to brief the issue. Both parties addressed that issue, as well as the issue of whether the panel correctly applied the good-faith exception. The

Government renewed the argument it made in the District Court that the good-faith exception applied because "Deputy McCannon's brief questioning of Campbell complied with this Court's then-binding precedent." Oral argument was then held before the *en banc* Court on June 15, 2021.

## II.

"A denial of a motion to suppress involves mixed questions of fact and law." *United States v. Spivey*, 861 F.3d 1207, 1212 (11th Cir. 2017) (quotation omitted). We review a district court's findings of fact for clear error, considering all the evidence in the light most favorable to the prevailing party—in this case, the Government. *Id.* But we review *de novo* a district court's application of the law to those facts. *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). As the parties do not contest the District Court's findings of fact, our review in this case is entirely *de novo*.

## III.

Before the *en banc* Court, Campbell argues (1) that the Government did not invoke the good-faith exception in its brief to the panel, so that defense is waived and should not be considered, and (2) that even if we do consider the good-faith exception, it should only apply when a "bright-line rule specifically authorize[s]" the officer's conduct. We disagree with him on both points. As we will discuss below, we may exercise our discretion to consider the good-faith exception despite the Government's failure to brief the

exception to the panel,[5] and we choose to do so based on the important policy reasons underlying the good-faith exception and the

---

[5] We note that the Government did properly brief the good-faith exception to the *en banc* Court as a reason to affirm the District Court. To aid the Court in reaching the correct decision, parties may make new arguments concerning the issues we direct them to brief in our *en banc* briefing notice. Were this not so, we would simply look to the panel briefs while sitting *en banc* instead of requesting the parties submit new briefs. *See* 11th Cir. R. 35-7 ("An en banc briefing schedule shall be set by the clerk *for all appeals in which rehearing en banc is granted by the court.*") (emphasis added). And, of course, we are "not limited to the particular legal theories advanced by the parties, but rather retain[] the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99, 111 S. Ct. 1711, 1718 (1991); *see also United States v. Undetermined Quantities of All Articles of Finished and In-Process Foods*, 936 F.3d 1341, 1350 (11th Cir. 2019) ("[T]he court is not limited to choosing one side's position or the other's. The court's role is to get it right, not to choose which side's argument is better and adopt it lock, stock, and barrel . . . . Indeed, the principle is so well settled that it is rarely mentioned."). The good-faith exception is closely related to the deterrence justification behind the exclusionary rule—we have observed that "although 'good faith' is most often framed as an 'exception' to the exclusionary rule, it is probably more accurately described as a reason for declining to *invoke* the exclusionary rule in the first place." *United States v. Taylor*, 935 F.3d 1279, 1289 n.12 (11th Cir. 2019). So, to the extent the good-faith exception is merely another argument for affirming the District Court's denial of the suppression motion, it has been properly made to the *en banc* Court.

But putting that aside, this Court may not consider issues forfeited on appeal without first applying one of our forfeiture exceptions, whether sitting as a panel or *en banc*. *See infra* Part III.A.i. As we have previously indicated that the Government "bears the burden of demonstrating that the good faith exception applies," the exception could also be conceptualized as a separate issue which the Government must raise. *United States v. Morales*, 987 F.3d 966, 974 (11th Cir. 2021). Accordingly, we analyze the good-faith exception

16-10128                Opinion of the Court                17

circumstances of this case.  Then, with the good-faith exception squarely before us, we will explain why the exception applies to McCannon's search of Campbell's car.

*A.*

Naturally, we start with whether we may consider the good-faith exception to affirm the District Court, despite the Government's failure to raise the exception in its brief before the panel. We begin by explaining how the party presentation principle interacts with our caselaw on abandonment, waiver, and forfeiture, and why issues not briefed on direct appeal should be treated as forfeited.  Next, we address the dissent's contention that this case involves waiver, not forfeiture.  We then turn to our forfeiture exceptions and explain why this is an extraordinary circumstance in which we have chosen to exercise our discretion to consider the good-faith exception in this case.

i.

Typically, issues not raised in the initial brief on appeal are deemed abandoned. *United States v. Levy*, 379 F.3d 1241, 1242–45 (11th Cir. 2004) (collecting cases).  Describing issues not raised in the initial brief as "abandoned" has a long history in this Court— our very first case as the Eleventh Circuit contained a footnote describing several of the appellant's claims as "abandoned" on appeal.

_____

under our forfeiture exceptions to explain why this is an extraordinary circumstance in which we may reach the good-faith exception even if it is a separate, forfeited issue.

*Bonner v. City of Prichard*, 661 F.2d 1206, 1209 n.4 (11th Cir. 1981) (*en banc*). However, our caselaw has been less than clear about whether an issue abandoned on appeal has been waived or merely forfeited—a problem made all the more troublesome by the way jurists sometimes use the words interchangeably. *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13, 124 S. Ct. 906, 917 n.13 (2004) (noting that "jurists often use the words [waiver and forfeiture] interchangeably") (quotation omitted); *compare United States v. Robles*, 408 F.3d 1324, 1326 n.1 (11th Cir. 2005) (describing abandoned claims as "waived"), and *United States v. Day*, 405 F.3d 1293, 1294 n.1 (11th Cir. 2005) (describing abandoned claims as "waived or abandoned"), *with United States v. Durham*, 795 F.3d 1329, 1331 (11th Cir. 2015) (*en banc*) (abrogating circuit precedent to allow parties to raise abandoned issues in supplemental filings when intervening Supreme Court precedent changes circuit law), and *United States v. Godoy*, 821 F.2d 1498, 1504 (11th Cir. 1987) (applying our forfeiture exceptions to reach an issue not raised in the district court or on appeal), and *United States v. Levy*, 391 F.3d 1327, 1335 (11th Cir. 2004) (Hull, J., concurring) ("The issue is not whether this Court has the power to consider issues not raised in the initial brief; of course it does."). This waiver/forfeiture distinction matters due to the party presentation principle.

Under the party presentation principle, American courts function in an "adversarial system of adjudication" whereby "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."

*United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). This system is "designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 244, 128 S. Ct. 2559, 2564 (2008) (quotation omitted). Accordingly, it is inappropriate for a court to raise an issue *sua sponte* in most situations. However, the "party presentation principle is supple, not ironclad," and there are "no doubt circumstances in which a modest initiating role for a court is appropriate." *Sineneng-Smith*, 140 S. Ct. at 1579. To this end, the Supreme Court has recognized a distinction between waived issues and forfeited issues. *Wood v. Milyard*, 566 U.S. 463, 470 n.4, 132 S. Ct. 1826, 1832 n.4 (2012); *Day v. McDonough*, 547 U.S. 198, 199, 126 S. Ct. 1675, 1678 (2006).

"Although jurists often use the words interchangeably, forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." *Kontrick*, 540 U.S. at 458 n.13, 124 S. Ct. at 917 n.13 (quotation omitted). As federal courts do not have "*carte blanche* to depart from the principle of party presentation basic to our adversary system," it is an "abuse of discretion" for a court "to override a [party's] deliberate waiver." *Wood*, 566 U.S. at 472–73, 132 S. Ct. at 1833–34 (quotations omitted). Waiver directly implicates the power of the parties to control the course of the litigation; if a party

affirmatively and intentionally relinquishes an issue, then courts must respect that decision.[6]

In contrast, courts do have the ability to "resurrect" forfeited issues *sua sponte* in "extraordinary circumstances." *Id.* at 471 n.5, 132 S. Ct. at 1833 n.5. This is because "the refusal to consider arguments not raised is a sound prudential practice, rather than a statutory or constitutional mandate, and there are times when prudence dictates the contrary." *Davis v. United States*, 512 U.S. 452, 464, 114 S. Ct. 2350, 2358 (1994) (Scalia, J., concurring). The degree to which we adhere to the prudential practice of forfeiture and the conditions under which we will excuse it are up to us as an appellate court. J. Dickson Phillips, Jr., *The Appellate Review Function: Scope of Review*, 47 Law & Cont. Probs. 1, 3 (1984). Consequently, we have identified five situations in which we may exercise our discretion to consider a forfeited issue: (1) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice; (2) the party lacked an opportunity to raise the issue at the district court level; (3) the interest of substantial justice is at stake; (4) the proper resolution is beyond any doubt; or (5) the issue presents significant questions of general impact or of great public concern. *Access Now, Inc. v. Sw. Airlines Co.*, 385

---

[6] However, there are limited exceptions even to this. For example, "[s]ubject-matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler*, 565 U.S. 134, 141, 132 S. Ct. 641, 648 (2012).

16-10128                Opinion of the Court                21

F.3d 1324, 1332 (11th Cir. 2004) (quotation omitted); *see also Go-doy*, 821 F.2d at 1504.[7]

    To clarify our caselaw, we hold that the mere failure to raise an issue in an initial brief on direct appeal should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* in extraordinary circumstances after finding that one of our *Access Now* forfeiture exceptions applies.[8]  We adopt

---

[7] The dissent takes issue with our application of the *Access Now* situations to the abandonment context.  Dissenting Op. at 43–44.  According to the dissent, the *Access Now* situations apply only to forfeitures that occur in the district court, not on appeal, and they "misfit" the abandonment context.  *Id.*  However, while we have most often used the *Access Now* situations to excuse forfeitures in the district court, we have also used them to address issues abandoned on appeal.  *See, e.g., Godoy*, 821 F.2d at 1504.  Furthermore, we took this case *en banc* largely to clarify any ambiguities in our caselaw concerning abandonment; even if we had not used the *Access Now* situations before in this context, we would still need to provide some rule for when we may exercise our discretion.  The *Access Now* situations provide a clear, well-developed standard for addressing forfeitures on appeal, and we see no problem with applying them in the abandonment context.  And, importantly, these situations only act as a first step in considering whether we will excuse a party's forfeiture; we must then decide whether extraordinary circumstances warrant exercising our discretion to excuse the forfeiture after finding an *Access Now* situation applies.

[8] The Supreme Court has also recently indicated that parties forfeit issues not briefed on appeal.  *See, e.g, TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 n.6 (2021); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 173, 136 S. Ct. 1969, 1978 (2016).  And we are not alone in holding that appellate courts may *sua sponte* address issues not raised in the initial briefs.  *Dorris v. Absher*, 179 F.3d 420, 425–26 (6th Cir. 1999) ("[T]he court may choose to entertain arguments not raised [in the briefs] by the parties when failure to do so would

this position for several reasons. First, our abandonment rule is prudential, not jurisdictional. *Levy*, 379 F.3d at 1244 (describing the rule as a "procedural default rule[]" that "serves valuable purposes"); *United States v. U.S. Stem Cell Clinic, LLC*, 998 F.3d 1302, 1312 (11th Cir. 2021) (Jordan, J., concurring) (explaining that "the abandonment rule (sometimes called the waiver rule) is prudential in nature"); *United States v. Higdon*, 418 F.3d 1136, 1137 (11th Cir. 2005) (Hull, J., concurring) ("This Court has repeatedly followed the prudential rule that new issues not raised in opening briefs will not be considered by the court."). As a prudential rule, we ought to be able to excuse a violation of the rule "when prudence dictates." *Davis*, 512 U.S. at 464, 114 S. Ct. at 2358 (Scalia, J., concurring). Treating a party's failure to raise an issue in its initial brief as a waiver would remove our discretion to consider issues not raised

---

constitute a miscarriage of justice."); *United States v. Hoyt*, 888 F.2d 1257, 1258 (9th Cir. 1989) ("Although Hoyt did not raise the constitutionality of the assessment in his appeal, a court of appeals may review issues *sua sponte* under exceptional circumstances, where substantial public interests are involved, or where to not do so would be unduly harsh to one or both of the parties."); *Cont'l Ins. Cos. v. Ne. Pharm. & Chem. Co., Inc.*, 842 F.2d 977, 984 (8th Cir. 1988) ("Ordinarily, we consider only issues argued in the briefs filed by the parties . . . [n]onetheless, we can consider issues not raised in the briefs or in oral argument, particularly when substantial public interests are involved."); *Consumers Union of U.S. v. Fed. Power Comm'n*, 540 F.2d 656, 662 (D.C. Cir. 1974) ("[W]e may also consider points not raised in the briefs or in oral argument."). However, due to the frequent confusion surrounding the terms "waiver" and "forfeiture," we feel it is appropriate to explain why issues not briefed on appeal are only forfeited, not waived.

16-10128                Opinion of the Court                23

when appropriate and would effectively transform our abandonment rule from prudential to jurisdictional.

Additionally, the Supreme Court has advised appellate lawyers to focus their briefing on their strongest, most pertinent arguments, even if they have many "colorable claims." *Jones v. Barnes*, 463 U.S. 745, 750–54, 103 S. Ct. 3308, 3312–14 (1983). As the Court explained:

> Most cases present only one, two, or three significant questions. Usually, if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weak arguments will be to dilute the force of the stronger ones.

*Id.* at 752, 103 S. Ct. at 3313 (quotation omitted). We have echoed the Supreme Court's advice, instructing lawyers to be "highly selective about the issues to be argued on appeal," even in death penalty cases. *Johnson v. Alabama*, 256 F.3d 1156, 1188 (11th Cir. 2001) (quoting *United States v. Battle*, 163 F.3d 1 (11th Cir. 1998)). And yet, lawyers cannot always know which issues or arguments an appellate court will find persuasive ahead of time. Classifying a failure to brief an issue as a waiver would unduly punish lawyers attempting to follow the Supreme Court's advice on appellate briefing by removing even the possibility of addressing an important issue not briefed in an extraordinary case. Forfeiture is a sufficient penalty to incentivize lawyers to timely and carefully brief

important issues while still leaving some leeway for both courts and parties.

And unlike forfeiture, which occurs automatically whenever a party fails to "timely assert" their rights, waiver is a question of intent. *Kontrick*, 540 U.S. at 458 n.13, 124 S. Ct. at 917 n.13. Intent is an evidentiary matter, but our review of the evidence is limited to the certified record. *Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999). While trial courts regularly conduct evidentiary hearings and make findings of facts, appellate courts lack both the procedures and the expertise to accept and evaluate new evidence. So, while a party can of course choose to waive its rights at any time, on appeal they can only do so through a clear, affirmative statement, as we are unable to conduct an evidentiary investigation into an ambiguous indication of intent.[9]

This clarification should not be taken as a weakening of our abandonment rule. Abandonment still incurs heavy penalties, even when treated as a forfeiture. After all, a party loses the *right* to demand consideration of an abandoned issue. *See Thomas v. Crosby*, 371 F.3d 782, 793 (11th Cir. 2004) (Tjoflat, J., concurring). To consider an issue abandoned on appeal, whether on a party's motion or *sua sponte*,[10] we must first find that one of our forfeiture

---

[9] Naturally, this does not impair our ability to review waivers that occurred in the district court, as the evidence for such waivers will be in the certified record.

[10] With the benefit of hindsight, we concede that it would have been wise for the panel to issue a supplemental briefing notice to direct the parties to brief

exceptions applies and then decide whether the issue is extraordinary enough for us to exercise our discretion and excuse the forfeiture. In most cases, an issue abandoned on appeal should still be dismissed without reaching the merits.

ii.

The Government failed to brief the good-faith exception on appeal. Accordingly, the exception is forfeited.[11] However, before

---

the good-faith-exception issue and our forfeiture exceptions before we addressed it *sua sponte*. Parties should have an opportunity to argue a ground abandoned on appeal before this Court relies on that ground. But now, the parties have had ample opportunity to brief the good-faith exception before the *en banc* Court. And, in any event, the parties both fully briefed the good-faith exception before the District Court. So, Campbell and the Government have had "an opportunity to reflect upon and respond in writing to the arguments that [their] adversary is raising." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012). There are thus no longer any concerns that the parties are unaware that this Court will address the good-faith exception.

[11] The dissent makes much hay out of the panel opinions' description of the Government's failure to brief the good-faith exception as waiver, not forfeiture. Dissenting Op. at 3–4, 19–20, 25. While both panel opinions did describe the briefing failure as a "waiver," they went on to explain that waiver is a "prudential doctrine," and so appellate courts could reach waived issues in limited circumstances. *United States v. Campbell*, 970 F.3d 1342, 1358–59 (11th Cir. 2020); *United States v. Campbell*, 912 F.3d 1340, 1355–56 (11th Cir. 2019). This description aligns with forfeiture, not waiver, and represents only a mislabeling on the part of the panel majority—a mislabeling which the Supreme Court has recognized is common in American jurisprudence. *Kontrick*, 540 U.S. at 458 n.13, 124 S. Ct. at 917 n.13. The dissent's implied suggestion that the *en banc* Court is overruling the panel to avoid the effects of waiver thus disregards the actual holdings of the panel opinions. And in any event, the panel

turning to our forfeiture exceptions, we pause to address the dissent's contention that the Government conceded it waived the good-faith exception at *en banc* oral argument. Dissenting Op. at 30. This supposed concession is based on the Government's acknowledgement that it was "conscious" of the good-faith exception when briefing to the panel. *Id.* at 27–30. There are several problems with the dissent's analysis.

The first and most egregious problem is that the dissent essentially conducted an evidentiary hearing at oral argument and then made findings of fact in its opinion. It is, of course, appropriate for an appellate judge to ask counsel at oral argument whether they are waiving or have waived an issue. Counsel will answer yes or no, and we may rely on that answer due to counsel's ethical obligations to this Court. The dissenting judges did not pursue this route.

Rather, the dissenting judges sought to elicit evidence at *en banc* oral argument about the Government's knowledge and intentions while writing its brief to the panel. They repeatedly questioned whether the omission of the good-faith exception was "unwitting" or "inadvertent" and whether the Government was "conscious" of the good-faith exception at the time. *Id.* at 27–29. These questions did not probe the caselaw, the certified record, or the Government's position on appeal, but instead sought testimony on

opinions are both vacated now and so do not bind the *en banc* Court or, indeed, anyone.

16-10128                Opinion of the Court                27

the knowledge and intentions of the Government attorney who wrote the panel brief in 2016, five years before the *en banc* oral argument.  Then, from the Government's acknowledgment that it was "conscious" of the good-faith exception—and conscious in the sense that the Government was "aware of the existence of the good-faith issue in the district court"—the dissent concludes that the Government intended to waive the good-faith exception in its opening brief to the panel.  *Id.* at 27–30.  This conclusion is effectively a finding of fact based on evidence adduced at oral argument.  It is akin to deciding a case based on an affidavit or exhibit handed to the Court during oral argument.  While the dissent may read Supreme Court precedent on waiver as requiring evidentiary hearings before appellate courts, *id.* at 31–33, we find no such requirement.  The dissent's antics would radically transform the nature of oral arguments in this Court, an ironic position for an opinion ostensibly aimed at limiting judicial power.[12]

---

[12] The dissent accuses us of "slicing the bologna a little thin" and of "magic-words formalism" by distinguishing between eliciting testimony at oral argument and asking a party what their legal position is or was.  Dissenting Op. at 31–32.  Let us explain further then.  The distinction lies in whether the court is treating the attorney as an attorney or as a witness.  Attorneys represent their clients and can make binding decisions in their name.  Witnesses testify about matters on which they have personal knowledge to aid the trier of fact in making findings of fact.  Fed. R. of Evid. 602.  We may inquire of attorneys about the legal positions their clients have taken throughout the course of the litigation.  We may not ask attorneys to provide new evidence with which to make our own findings of fact.  This distinction between treating attorneys as attorneys versus treating attorneys as witnesses is absolutely critical, as the

Even if we were to consider the dissent's evidence of waiver, we would be unpersuaded. For starters, the Government attorney who argued before the *en banc* Court, Francesco Valentini, did not write the Government's brief to the panel. Valentini did not even appear in this case until shortly before we granted *en banc* review in 2020. Any information he may have had about the panel brief writer's knowledge or intentions would be hearsay, and reliance on hearsay is a dubious proposition at best.[13]

---

latter situation usurps the role of the trier of fact on appeal. As we have explained, the dissent is treating the Government attorney as a witness by making dispositive findings of fact based on information elicited at oral argument about what the panel brief writer—an entirely different attorney—knew or intended five years prior when writing the Government's panel brief. This determination is beyond the scope of appellate court review, and we refuse to engage in it.

[13] Notably, the dissent never outright denies that Valentini's testimony is hearsay. Instead, the dissent responds by pointing out that Valentini is a Government attorney authorized to speak on the Government's behalf and by reiterating that Valentini described the Government's actions as "conscious" at oral argument despite describing them as "unwitting" in the *en banc* brief he authored. Dissenting Op. at 33–35. Respectfully, we fail to see how either of these points is relevant. Waiver is a matter of intent, and the supposed waiver here occurred in the Government's brief to the panel. Accordingly, it is the intent of the panel brief writer that controls. Valentini's status as a Government agent does not grant him any special knowledge about the panel brief writer's knowledge or intentions five years prior. Likewise, the apparent contradiction between what Valentini wrote in the Government's *en banc* brief and what he said at oral argument also does not indicate any special knowledge about the panel brief writer's knowledge or intentions—if anything, this contradiction undermines his credibility as a witness. And, of course, this whole discussion on hearsay only serves to further underscore the

The dissent also only credits the portions of the Government's testimony that supports its position. The dissent ignores or discounts the Government's multiple statements that it did not make a "strategic" decision not to brief the good-faith exception. These statements are inconvenient for the dissent because they indicate the Government merely made a mistake by failing to brief the good-faith exception and thus had no intention to affirmatively waive the exception. Of course, were this Court a trial court, we could choose to credit some portions of the Government's testimony and discredit others—but we are not a trial court. The dissent seems to have forgotten this simple fact.

The final problem with the dissent's analysis is that it treats the mere failure of the Government to brief the good-faith exception as an affirmative waiver, simply because the Government was aware of the exception. For the reasons explained above, we think it is more appropriate to treat the failure to raise an issue in a brief as forfeiture, not waiver—a position with which the dissent nominally agrees. Dissenting Op. at 25. However, the dissent's analysis is premised on the idea that if a party is aware of an issue and does not brief it, they necessarily must have intended to waive the position. This conception of waiver would require us to treat any issue discussed in the district court but not briefed on appeal as waived, as the lawyer on appeal would at least have constructive

_____

absurdity of appellate courts eliciting testimony at oral argument and then relying on that testimony to decide the case.

knowledge of the district court argument. So while the dissent may claim to agree that the mere failure to brief an issue on appeal results in forfeiture, its reasoning would only allow appellate courts to excuse a party's failure to brief an issue on appeal when that issue also was not raised in the district court. Requiring a double forfeiture to excuse a forfeiture on appeal would be a strange rule indeed, and one that would effectively extinguish much of the discretion we have to consider important issues not raised by the parties in extraordinary circumstances. We believe treating the mere failure to brief an issue as forfeiture strikes the appropriate balance between respecting the party presentation principle and retaining the discretion to address important issues in extraordinary circumstances.

iii.

Turning to the forfeiture exceptions, we conclude that the fourth exception—where the proper resolution of the issue is beyond any doubt—applies here. As we explain in part III.B.iii, *United States v. Griffin*, 696 F.3d 1354 (11th Cir. 2012), which established this Court's standard for prolongation prior to *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609 (2015), is on all fours with this case. The District Court found that McCannon's conduct during the stop conformed to *Griffin*'s prolongation standard. Had the District Court realized that *Rodriguez* abrogated *Griffin*, we have no doubt that the Court would have denied the suppression motion under the good-faith exception instead—in fact, the Court explicitly stated that it did not address the exception only

"[b]ecause the stop, search, and seizure in this case were lawful." Accordingly, we have all the findings of fact necessary to consider whether McCannon acted in good faith reliance on *Griffin*, and that purely legal conclusion jumps off the page. Even the dissent does not contest that the proper resolution of applying the good-faith exception is beyond any doubt, should we reach it.

Having identified an applicable forfeiture exception, we must now determine whether this case presents an extraordinary circumstance such that we should exercise our discretion to excuse the Government's forfeiture. In light of the policy underpinnings of the exclusionary rule and the specific circumstances of this case, we conclude that it does.

The Supreme Court has repeatedly emphasized that "the governments' use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution." *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 362, 118 S. Ct. 2014, 2019 (1998); *see United States v. Leon*, 468 U.S. 897, 906, 104 S. Ct. 3405, 3411–12 (1984); *Stone v. Powell*, 428 U.S. 465, 482, 486, 96 S. Ct. 3037, 3046–47, 3048–49 (1976). Instead, the exclusionary rule is "a judicially created means of deterring illegal searches and seizures." *Scott*, 524 U.S. at 363, 118 S. Ct. at 2019. The exclusionary rule's "sole purpose," the Supreme Court has elaborated, "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37, 131 S. Ct. 2419, 2426 (2011). But because the exclusionary rule is "prudential rather than constitutionally mandated," it is "applicable only where its deterrence benefits outweigh

its substantial social costs." *Scott*, 524 U.S. at 363, 118 S. Ct. at 2019 (quotations omitted). These costs—which include the requirement that courts "ignore reliable, trustworthy evidence bearing on guilt or innocence"—exact a "heavy toll on both the judicial system and society at large." *Davis*, 564 U.S. at 237, 131 S. Ct. at 2427. This is because the ultimate effect of the exclusionary rule "in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.*

The deterrence value provided by exclusion corresponds to "the culpability of the law enforcement conduct" at issue. *Herring v. United States*, 555 U.S. 135, 143, 129 S. Ct. 695, 701 (2009). "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 564 U.S. at 238, 131 S. Ct. at 2427 (quotations omitted). But when an officer "conducts a search in reliance on binding appellate precedent," he "does no more than act as a reasonable officer would and should act under the circumstances." *Id.* at 241, 131 S. Ct. at 2429 (quotation omitted). In other words, an officer who relies on binding appellate precedent has no culpability whatsoever. Excluding evidence in these circumstances would only serve "to discourage the officer from doing his duty." *Id.* (quotation omitted). And the exclusionary rule simply cannot "pay its way" without offsetting its high social costs with commensurate deterrence value. *Leon*, 468 U.S. at 907 n.6, 104 S. Ct. at 3412 n.6 (quotations omitted). Suppression of evidence, then, is our "last resort, not our first

16-10128                 Opinion of the Court                      33

impulse." *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 2163 (2006).

As the Supreme Court's precedent on the exclusionary rule and the good-faith exception makes clear, this Court has an extraordinary interest in protecting the public and encouraging good police work by ensuring that evidence obtained in good faith reliance on binding appellate precedent is not excluded. And since the focus of the exclusionary rule is solely on deterring police misconduct, there is little sense in excluding evidence based on Government counsel's mistakes. Standing alone, the strong policy considerations underlying the exclusionary rule may well be sufficient to justify exercising our discretion to excuse the Government's forfeiture and address the merits. However, there are also case specific reasons for why this case presents an extraordinary circumstance such that we should exercise our discretion to excuse the Government's forfeiture of the good-faith exception.

Chief amongst these reasons is the District Court's treatment of the suppression motion. The District Court correctly concluded that McCannon's actions conformed with the *Griffin* standard. *See infra* Part III.B.iii. On that basis, the Court correctly denied the suppression motion. The Court's only error was applying *Griffin* to the wrong part of the exclusionary rule test—here, *Griffin* spoke to the deterrence value of exclusion, not to whether a Fourth Amendment violation occurred. We are loath to reverse the District Court simply because the Government failed to adequately defend the Court's ultimately correct judgment. And we

have "discretion to affirm on any ground supported by the law and the record that will not expand the relief granted below." *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1654 (2018); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S. Ct. 454, 459 (1943) ("[W]e do not disturb the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct 'although the lower court relied upon a wrong ground or gave a wrong reason.'" (quoting *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S. Ct. 154, 158 (1937))). Exercising our discretion to reach the good-faith exception is thus particularly appropriate in this case to avoid reversing a correct judgment.

This case is also extraordinary as it is a good-faith exception case in which there are no material factual disputes.[14] Accordingly, the question of whether the good-faith exception applies has become a pure question of law in which the policy considerations behind the exclusionary rule lay starkly before us. And just as trial courts are particularly well-suited to making findings of fact, appellate courts are particularly well-suited to answering questions of law. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 232, 111 S. Ct. 1217, 1221 (1991) ("Courts of appeals . . . are structurally suited to the collaborative juridical process that promotes decisional accuracy. With the record having been constructed below and settled for purposes of the appeal, appellate judges are able to devote their

---

[14] Unlike, for example, a case involving good-faith reliance on a warrant, in which there are often substantive factual disputes. *See Leon*, 468 U.S. at 922–25, 104 S. Ct. at 3420–22.

primary attention to legal issues."). This case is thus well within our wheelhouse as an appellate court—we need only apply our own formerly binding precedent to uncontested facts to protect the clear and pressing interests of society at large.

Finally, this is an extraordinary case because Campbell's own arguments to the panel placed the good-faith exception squarely before us, even though neither he nor the Government directly addressed the issue. Campbell argued before the panel that *Rodriguez* rejected a *de minimis* prolongation rule and thus abrogated *Griffin.* We agree. *See infra* Part III.B.ii. But arguing that a Supreme Court case abrogated circuit precedent and thus rendered an officer's stop unconstitutional after the fact logically implicates the possibility of good faith reliance on binding appellate precedent. This is even more true when the District Court explicitly found in its denial of the suppression motion that the officer's conduct conformed to our previously binding appellate precedent's requirements. To ignore the good-faith exception, we would have to deliberately blind ourselves to the facts of this case and to the controlling law while also disregarding the obvious legal implications of Campbell's arguments. We simply cannot do this and retain our integrity as an independent court of law.

The party presentation principle is a real limit on the ability of American courts to consider issues not presented by the parties. We may not consider issues intentionally waived by the parties, and we should not consider forfeited issues except in extraordinary circumstances. This is one such extraordinary circumstance. For

the reasons expressed above, we choose to exercise our discretion to excuse the Government's forfeiture and address the good-faith exception.

## B.

Having resolved the issue of whether we will excuse the Government's forfeiture of the good-faith exception, we turn to the merits of this case. Below, we first address whether Campbell's rapidly blinking turn signal provided McCannon with reasonable suspicion to believe that Campbell's Maxima violated the traffic code. Then, we proceed to the issue of whether McCannon's questions unlawfully prolonged his stop of Campbell. And, to wrap up, we determine whether the good-faith exception applies in this case.

## i.

A traffic stop is a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S. Ct. 1769, 1772 (1996). And to comply with the Fourth Amendment, an officer must have reasonable suspicion. *Heien v. North Carolina*, 574 U.S. 54, 60, 135 S. Ct. 530, 536 (2014) ("All parties agree that to justify [a traffic stop], officers need only reasonable suspicion[.]" (quotation omitted)).[15]   In other words, an officer

---

[15] The parties and the District Court mention needing reasonable suspicion or probable cause. This framing is understandable given the Supreme Court's declaration in *Whren* that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810, 116 S. Ct. at 1772. We have also echoed that standard. *See United States v. Pierre*, 825 F.3d 1183, 1192 (11th Cir. 2016)

making a stop must have "a particularized and objective basis for suspecting the person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396, 134 S. Ct. 1683, 1687 (2014) (alteration adopted) (quotations omitted). Even minor traffic violations qualify as criminal activity. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1277 (11th Cir. 2003); *see also Holeman v. City of New London*, 425 F.3d 184, 189–90 (2d Cir. 2005). So, the question here is whether Campbell's rapidly blinking turn signal created reasonable suspicion that a traffic violation had occurred. We conclude that it did.

The warning Campbell received stated that he had a "defective" turn signal. In Georgia, the proper functioning of a turn signal is covered by O.C.G.A. § 40–8–26, which, for our purposes, requires two things. First, the statute requires that a vehicle be equipped with right and left turn signal lights that are "visible and understandable during daytime and nighttime from a distance of 300 feet from both the front and the rear." § 40–8–26(a)(2), (b). And second, those signal lights "shall at all times be maintained in good working condition." *Id.* These requirements are, as the District Court correctly noted, separate. If they were not, only when an otherwise-adequate signal light completely failed to function

("Pursuant to the Fourth Amendment, police may stop a vehicle if they have probable cause to believe that a traffic violation has occurred."). But the Supreme Court has since made clear that reasonable suspicion is all that is required. *See Heien*, 574 U.S. at 60, 135 S. Ct. at 536. In other words, while probable cause is sufficient, only reasonable suspicion is necessary.

would the statute be violated, and the "good working condition" language of the statute would be rendered superfluous. Because it is "canonical that courts must read a statute to give effect to all provisions and avoid rendering any part 'inoperative or superfluous, void or insignificant,'" "good working condition" must mean more. *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 977 (11th Cir. 2014) (quoting *Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566 (2009))

Typically, when a turn signal blinks rapidly, it does so to notify the driver that a bulb is out or is about to go out. At least one other federal court has noted as much. *United States v. Baley*, 505 F. Supp. 3d 481, 489 (E.D. Pa. 2020) ("Finally, after turning on the siren and initiating the stop, the officers noticed that Baley's turn signal was blinking rapidly, indicating that a front turn signal was likely burnt out[.]"). A rapidly blinking bulb could also mean that there is a problem with the wiring. Either way, the rapid blinking is an alert that *something* in the signal light may not be functioning correctly and thus is not in "good working condition." As a result, the rapidly blinking turn signal provided McCannon with reasonable suspicion to believe that Campbell's car violated O.C.G.A § 40–8–26. And, on that basis,[16] we affirm the District Court's conclusion that McCannon's initiation of the stop was lawful.

---

[16] The District Court also noted that even if McCannon was mistaken that the rapidly blinking turn signal violated the "good working condition" requirement of § 40–8–26, his mistake would be a reasonable mistake of law and thus

ii.

Now, we have to determine whether any of the questions McCannon asked Campbell unlawfully prolonged the stop. Let's start with the fundamentals.

Even if the police have reasonable suspicion to make a traffic stop, they do not have unfettered authority to detain a person indefinitely. The detention is "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1326 (1983) (plurality opinion). Officers must conduct their investigation diligently. *See Rodriguez*, 575 U.S. at 357, 135 S. Ct. at 1616 ("[T]he Government acknowledges that an officer always has to be reasonably diligent." (quotations omitted)); *see also United States v. Place*, 462 U.S. 696, 709, 103 S. Ct. 2637, 2645 (1983) ("[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation."). And officers cannot unlawfully prolong a stop. *See Rodriguez*, 575 U.S. at 354–57, 135 S. Ct. at 1614–16.

The Supreme Court expanded on unlawfully prolonged traffic stops in *Rodriguez*. In that case, a K-9 officer in Nebraska pulled over a Mercury Mountaineer—a sport utility vehicle—for swerving onto the shoulder. *Id.* at 351, 135 S. Ct. at 1612. After writing a warning ticket and returning the license, registration, and proof of insurance to the driver, the officer made the driver and passenger

---

"give rise to the reasonable suspicion necessary" to validate the stop and uphold the seizure. *See Heien*, 574 U.S. at 57, 135 S. Ct. at 534.

wait for seven or eight minutes while he conducted a dog sniff. *Id.* at 351–52, 135 S. Ct. at 1613. The dog discovered contraband, and the driver sought to suppress the evidence. *Id.* at 352, 135 S. Ct. at 1613. On appeal, the Eighth Circuit determined that a seven- or eight-minute delay is a permissible *de minimis* intrusion. *Id.* at 353, 135 S. Ct. at 1614. But the Supreme Court disagreed. *Id.* at 354–57, 135 S. Ct. at 1615–16.

The Supreme Court explained that a traffic stop is analogous to a *Terry* stop. *Id.* at 354, 135 S. Ct. at 1614. So, the scope of the stop "must be carefully tailored to its underlying justification." *Id.* (quoting *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325). It follows that, in the context of a traffic stop, "the tolerable duration of police inquiries . . . is determined by the seizure's mission[.]" *Id.* (quotations omitted). The mission of a traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns[.]" *Id.* (citation omitted). And the stop may "last no longer than is necessary" to complete its mission. *Id.* (quoting *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325). In other words, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

At this point, an obvious question comes to mind: what inquiries are "related" to a stop's purpose? The Supreme Court identified a number of tasks it says are "ordinary inquiries incident to [the traffic] stop." *Id.* at 355, 135 S. Ct. at 1615 (alteration in original) (quotations omitted). These inquiries include "checking the driver's license, determining whether there are outstanding

warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* Inquiries such as these ensure "that vehicles on the road are operated safely and responsibly." *Id.*

But the Supreme Court has also identified tasks and inquiries that are unrelated to a stop's purpose. For example, in *Arizona v. Johnson*, the Court explained that asking about a passenger's gang affiliation during a traffic stop is not related. *See* 555 U.S. 323, 332–34, 129 S. Ct. 781, 787–88 (2009). Likewise, using a dog to search for contraband is not related. *Rodriguez*, 575 U.S. at 355–56, 135 S. Ct. at 1615. A dog sniff lacks "the same close connection to roadway safety as the ordinary inquiries," and cannot be "fairly characterized as part of the officer's traffic mission." *Id.* at 356, 135 S. Ct. at 1615. Instead, a dog sniff is "aimed at detect[ing] evidence of ordinary criminal wrongdoing." *Id.* at 355, 135 S. Ct. at 1615 (alteration in original) (quotations omitted). So, comparing the related and unrelated tasks, we can conclude that related tasks are the "ordinary inquiries incident to a traffic stop," while unrelated tasks are "other measures aimed at detecting criminal activity more generally." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (quotation omitted) (interpreting *Rodriguez*).

But whether an inquiry is "related" or "unrelated" doesn't end our analysis. Unrelated inquiries are permitted so long as they do not add time to the stop. *Rodriguez*, 575 U.S. at 355, 135 S. Ct. at 1615 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent . . . reasonable suspicion[.]").

42                      Opinion of the Court                    16-10128

The *Rodriguez* Court suggested that this conclusion——commanding that a stop "may last no longer than is necessary" to complete its purpose—was a simple application of its precedents. *Id.* at 354, 135 S. Ct. at 1614 (quotation omitted). But this Court, along with a number of our sister circuits,[17] had interpreted those same precedent cases to establish a different standard.

In *United States v. Griffin*, we considered the appropriate standard to decide prolongation cases. 696 F.3d at 1357. To do so, we looked to the Supreme Court's ruling in *Johnson*,[18] where the

---

[17] Almost all of the circuits developed a rule looking to whether the length of the stop as a whole was reasonable and finding that brief extensions did not transform the stop into an unreasonable seizure. *See United States v. McBride*, 635 F.3d 879, 883 (7th Cir. 2011); *United States v. Everett*, 601 F.3d 484, 493–94 (6th Cir. 2010); *United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010), *abrogation recognized by United States v. Gomez*, 877 F.3d 76, 89–90 (2d Cir. 2017); *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009); *United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008), *abrogation recognized by United States v. Williams*, 808 F.3d 238, 246–47 (4th Cir. 2015); *United States v. Turvin*, 517 F.3d 1097, 1101–02 (9th Cir. 2008); *United States v. Olivera-Mendez*, 484 F.3d 505, 510–11 (8th Cir. 2007); *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007).

[18] We also looked to the Supreme Court's decision in *Muehler v. Mena*, 544 U.S. 93, 125 S. Ct. 1465 (2005). *See Griffin*, 696 F.3d at 1360–61. In *Mena*, an officer questioned "a person about her immigration status while she was detained during the execution of a search warrant—by other law enforcement officers—for deadly weapons and evidence of gang membership." *Id.* (citing *Mena*, 544 U.S. at 95–96, 125 S. Ct. at 1468). Because the questioning did not prolong the detention, the Court held that the officers did not need independent reasonable suspicion to ask about her immigration status. *Mena*, 544 U.S. at 101–02, 125 S. Ct. at 1471–72. Thus, *Mena* is fully consistent with the idea

16-10128                 Opinion of the Court                    43

Court condoned unrelated inquiries "so long as those inquiries do not measurably extend the duration of the stop." *Id.* at 1361 (quoting *Johnson*, 555 U.S. at 333, 129 S. Ct. at 788).[19]  Based on the language from *Johnson*, we determined that the issue of whether unrelated questions "measurably extended or prolonged the duration of the stop so as to make it unreasonable under the Fourth Amendment" should be decided by an overall reasonableness standard. *Id.* at 1362 (quotation omitted) ("To address this issue, we do not simply look at the interval of prolongation in isolation, but rather assess the length of the stop as a whole, including any extension of the encounter, by undertaking a fact-bound, context-dependent analysis of all of the circumstances concerning the stop and the unrelated questions." (quotation omitted)).

But the Supreme Court rejected the overall reasonableness standard in *Rodriguez*.  There, the Government argued that it is acceptable to "incremental[ly] prolong a stop" for unrelated inquiries so long as the officer is diligent "*and the overall duration of the stop remains reasonable*[.]" *Rodriguez*, 575 U.S at 357, 135 S. Ct. at 1616 (alteration in original) (emphasis added) (quotation

_____

that unrelated inquiries are permitted only if they do not add time to the stop. The unrelated questions did not prolong the stop because other officers executed the search warrant.

[19] The standard from *Johnson* resembled the one from *Caballes*, where the Court said a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005).

omitted).  The Court disagreed, noting that the Government's position would effectively grant officers "bonus time to pursue an unrelated criminal investigation" if they complete the "traffic-related tasks expeditiously[.]"  *Id.*  That cannot be right.  Instead, courts must look at what an officer actually does: if he "can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'"  *Id.* (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005)).  And "a traffic stop prolonged beyond that point is unlawful."  *Id.* (quotation omitted).  Put simply, a stop can be unlawfully prolonged even if done expeditiously.

The Supreme Court also rejected the reasoning from *Griffin*.  In *Griffin*, an officer stopped and frisked a person suspected of theft.  696 F.3d at 1357.  During the frisk, the officer asked the suspect: "Hey, what's in your pocket?  Why do you have batteries?"  *Id.*  These questions were "unrelated to the attempted theft or the frisk for weapons," *id.* at 1358, and prolonged the stop by about thirty seconds, *id.* at 1362.  We offered two reasons for finding that the stop was not unlawfully prolonged.  First, the officer "acted diligently."  *Id.*  But as explained above, diligence does not provide an officer with cover to slip in a few unrelated questions.  Second, the officer "had not yet completed his investigation."  *Id.*  The *Rodriguez* Court rebuffed this argument as well: the "critical question . . . is not whether the [unrelated inquiry] occurs before or after the officer issues the ticket . . . but whether conducting the [unrelated inquiry] 'prolongs'—*i.e.*, adds time to—'the stop.'"  *Rodriguez*, 575

16-10128                Opinion of the Court                45

U.S. at 357, 135 S. Ct. at 1616.  In other words, an officer can prolong a stop before or after completing the investigation.

Neither can *Griffin* be distinguished because of the time difference.  Although the unrelated questions in *Griffin* prolonged the stop by about thirty seconds, *Griffin*, 696 F.3d at 1362, and the dog sniff in *Rodriguez* prolonged the stop by seven to eight minutes, *Rodriguez*, 575 U.S at 352, 135 S. Ct. at 1613, the Supreme Court was clear that the length of time is immaterial.  The Court rejected the Eighth Circuit's *de minimis* rule, under which minor extensions of seizures were tolerated.  *See id.* at 355–57, 135 S. Ct. at 1615–16.  To differentiate *Griffin* on the grounds that a thirty second delay is less serious than a seven-minute delay would revive a standard—be it characterized as a *de minimis* rule or as overall reasonableness—that the Supreme Court specifically rejected.  Bottom line: *Griffin* cannot be squared with *Rodriguez*.  Accordingly, we find that *Rodriguez* abrogates *Griffin*.

The proper standard for addressing an unlawfully prolonged stop, then, is this: a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes.  *See id.* at 353–57, 135 S. Ct. at 1614–16; *see also Green*, 897 F.3d at 179.  In other words, to unlawfully prolong, the officer must (1) conduct an

unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion.[20]

With that understanding of *Rodriguez*, we turn to the questions McCannon asked during the stop. We'll start with the various questions McCannon asked about Campbell's travel plans.

Generally speaking, questions about travel plans are ordinary inquiries incident to a traffic stop. *See United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) ("[O]ur case law allows an officer carrying out a routine traffic stop . . . to inquire into the driver's itinerary."), *cert. denied*, 138 S. Ct. 346 (2017); *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011) (stating that tasks related to a traffic violation include "inquiring about the occupants' destination, route, and purpose"); *United States v. Brigham,* 382 F.3d

---

[20] Most circuits that have addressed *Rodriguez* have reached a similar conclusion. *See United States v. Stewart*, 902 F.3d 664, 674 (7th Cir. 2018) (suggesting that seventy-five seconds used to call for backup might unlawfully prolong the stop, but the record was inadequate to determine if the officer's purpose was for safety or a dog sniff), *reh'g en banc denied* (Oct. 26, 2018); *United States v. Clark*, 902 F.3d 404, 410–11 (3d Cir. 2018) (finding that twenty seconds of unrelated questioning prolonged the stop); *United States v. Bowman*, 884 F.3d 200, 219 (4th Cir. 2018) (finding that an officer did not have consent or reasonable suspicion to question a passenger after the mission was completed); *United States v. Gomez*, 877 F.3d 76, 88–93 (2d Cir. 2017) (rejecting a reasonableness test, instead determining whether the unrelated inquiry adds time to the stop at all, and ultimately finding that asking a few questions about drugs prolonged the stop); *United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017) (holding that unrelated questioning prolonged the stop). *But see United States v. Collazo*, 818 F.3d 247, 257–58 (6th Cir. 2016) (using language suggesting an overall reasonableness standard).

500, 508 (5th Cir. 2004) (*en banc*) ("An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop."); *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003) ("[Q]uestions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."); *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop.").

And, in this case, Campbell's travel plans were relevant to the traffic violation—a malfunctioning turn signal. In McCannon's experience, a rapidly blinking turn signal indicated that a bulb is either out or is about to go out. Since Campbell was planning on traveling a long distance, the chances that his turn signal would stop working while he was driving increased. So, asking about Campbell's travel plans was a related and prudent part of investigating his malfunctioning turn signal.[21]

The same is not true, however, for McCannon's questions about the contraband in Campbell's car. Just before he asked for Campbell's consent to search the Maxima, McCannon asked:

---

[21] Admittedly, McCannon acknowledged that the reason he took such interest in Campbell's destination was because that part of Augusta was a high crime area. But in this area of the law, we do not consider officers' subjective motivations. *See Whren*, 517 U.S. at 813, 116 S. Ct. at 1774.

"[Do you have] any counterfeit merchandise that you are taking to your relatives over there in Augusta? And what I mean by that is—any purses? Shoes? Shirts? Any counterfeit or bootleg CDs or DVDs or anything like that? Any illegal alcohol? Any marijuana? Any cocaine? Methamphetamine? Any heroin? Any ecstasy? Nothing like that? You don't have any dead bodies in your car?"

These questions are—fairly obviously—unrelated to a traffic stop for a malfunctioning turn signal and crossing the fog line. Instead, they are precisely the type of questions *Rodriguez* prohibits—those about "crime in general [and] drug trafficking in particular." *See Rodriguez*, 575 U.S. at 357, 135 S. Ct. at 1616. And they extended the stop by approximately twenty-five seconds. As a result, we conclude that McCannon's questions about the contraband in Campbell's car unlawfully prolonged the stop.

### iii.

If an officer unlawfully prolongs a stop, any evidence uncovered as a result may be suppressed. *See Davis*, 564 U.S. at 231–32, 131 S. Ct. at 2423. But the mere fact that McCannon may have unlawfully prolonged Campbell's stop is not the end of our inquiry. As we discussed in part III.A.iii, the exclusionary rule is subject to exceptions and does not automatically apply.

Remember, "when the police conduct a search in compliance with binding precedent that is later overruled," we will not apply the exclusionary rule. *Id.* at 232, 131 S. Ct. at 2423. Again,

this is a sensible practice: when an officer acts in reliance on binding precedent during a search, excluding evidence uncovered in that search would do nothing to deter future police misconduct and would instead exact high costs on public safety. *Id.*

At the time of Campbell's arrest, *Griffin* was our last word on the issue of prolongation. 696 F.3d at 1630–32. As noted in part III.B.ii, *Griffin* held that an officer's unrelated questioning lasting no more than thirty seconds did not unconstitutionally prolong the stop because the officer "had not yet completed his investigation . . . and because he acted diligently[.]" *Id.* at 1362.

In his *en banc* briefing, Campbell contends that *Davis*'s good-faith exception should apply only "when a bright-line rule specifically authorized the type of search or seizure at issue." *Griffin*, Campbell argues, is not such a case. Instead, he believes that *Griffin* "did not specifically authorize . . . suspicionless prolongations of traffic stops" and instead "explicitly rejected a bright-line no prolongation rule." As a result, Campbell states that McCannon was not permitted to rely on *Griffin* for purposes of the good-faith exception. For a few reasons, we believe Campbell is mistaken.

First, we think Campbell's read of *Davis* is too narrow. In *Davis*, the Supreme Court held that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Davis*, 564 U.S. at 249–50, 131 S. Ct. at 2434. On its face, this holding suggests no limitation on the "type" of "binding appellate precedent" that officers may rely on. And the rest of the *Davis* decision reveals no such

limit.  Throughout the opinion, the Court referred to "binding precedent" and "appellate precedent" without once mentioning whether that precedent was limited to cases involving "bright-line rules."  *Id.* at 231–50, 131 S. Ct. at 2423–34.  The fact that *Davis* happened to involve a bright-line rule is entirely coincidental.

Second, Campbell misunderstands our holding in *Griffin*.  He contends that "the *Griffin* holding was a far cry from . . . a bright-line precedent that categorically and unequivocally authorized a search or seizure" because it "did not purport to guide police officers."  It follows, he argues, that "*Griffin* did not pre-authorize a suspicionless expansion of Mr. Campbell's detention."  Campbell is right on the first point: we expressly declined "to adopt a bright-line no prolongation rule" in *Griffin*.  *Griffin*, 696 F.3d at 1362 (quotations and citation omitted).  But he is wrong on the second.  We stated in *Griffin* that "unrelated questions posed during a valid *Terry* stop do not create a Fourth Amendment problem unless they measurably extend the duration of the stop."  *Id.* (quotation omitted).  Although our pronouncement of the rule came in the context of a *Terry* stop, the reasoning for our prolongation rule was not *Terry*-bound.  Instead, we simply looked at what the Fourth Amendment required and stated that it was not violated when (i) an officer's unrelated questioning preceded the "complet[ion] [of the authorized] investigation," (ii) that questioning "lasted [no] more than 30 seconds," and (iii) the officer "acted diligently" in completing the stop.  *Id.*  Nothing in *Griffin* suggests that the prolongation rule applied only to *Terry* stops.  So, the fact that *Griffin*

declined to provide a bright-line rule does not relegate it to a category of "non-binding" appellate precedent.

And third, Campbell's "bright-line" theory is inconsistent with the purpose of the exclusionary rule. At risk of repetition, the exclusionary rule's "sole purpose" is to "deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236–37, 131 S. Ct. at 2426. Police conduct "trigger[s] the harsh sanction of exclusion only when [it is] deliberate enough to yield meaningful deterrence and culpable enough to be worth the price paid by the justice system." *Id.* at 240, 131 S. Ct. at 2428 (alteration adopted) (quotations omitted). And "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* at 238, 131 S. Ct. at 2427 (quotations omitted). But when officers act in reliance on binding precedent—even if that precedent does not contain a "bright-line" rule—they are not acting deliberately, recklessly, or with gross negligence. And when officers do not act deliberately, recklessly, or with gross negligence, they lack the culpability required to apply the exclusionary rule. "[A]bsence of police culpability dooms" the application of the exclusionary rule, *id.* at 240, 131 S. Ct. at 2428, because without culpable conduct, deterrence simply cannot "pay its way." *Leon*, 468 U.S. at 907 n.6, 104 S. Ct. at 3412 n.6. Were we to start splitting hairs between "bright-line" and "fact-intensive" rules, it is difficult to imagine that any officer would ever know which precedent is safe to rely on.

So, convinced that the good-faith exception allows officers to rely on cases without "bright-line" rules, we finally turn to whether the facts of this case fit squarely within *Griffin*. We conclude that they do.

This case and *Griffin* bear a number of similarities. In *Griffin*, the officer lawfully stopped Griffin to investigate whether he had stolen some clothing. *Griffin*, 696 F.3d at 1357–58. Here, McCannon lawfully stopped Campbell to investigate a traffic violation. In *Griffin*, the officer's unrelated questioning lasted approximately thirty seconds. *Id.* at 1362. Here, McCannon's unrelated questioning lasted approximately twenty-five seconds. In *Griffin*, the officer had not yet completed the stop when he asked the unrelated questions. *Id.* Here, McCannon had not yet completed the stop when he asked the unrelated questions. In *Griffin*, the officer "acted diligently." *Id.* And here, the District Court found that McCannon "diligently investigated" the traffic violations and "expeditiously" completed the citations. We cannot say that the District Court erred in making this finding, and the similarities between this case and *Griffin* lead to only one conclusion: *Griffin* controls. So, because McCannon acted in "objectively reasonable reliance on binding appellate precedent," the good-faith exception applies. *Davis*, 564 U.S. at 232, 131 S. Ct. at 2423–24.[22]

---

[22] Because the good-faith exception applies, we need not reach the issue of whether Campbell's consent to the search purged the taint from the unlawfully prolonged seizure. When a stop is unlawfully prolonged, the seizure becomes unconstitutional, and any subsequent discovery of evidence produced

## IV.

Although we are usually reluctant to address matters the parties have not argued on appeal, this reluctance is discretionary, not mandatory. Absent an affirmative waiver by a party, we may exercise our discretion to address an issue not raised in an opening brief in extraordinary circumstances. As the Government did not waive the good-faith exception, we choose to raise the exception *sua sponte* due to the strong policy considerations underlying the exclusionary rule and the circumstances of this case.

With that settled, we conclude that Deputy Sheriff McCannon had reasonable suspicion to stop Campbell for a traffic violation. But he unlawfully prolonged the stop when he asked Campbell unrelated questions about contraband in his car. Although this could result in suppression of the evidence found in Campbell's car, upon consideration of our binding precedent at the time of the stop, we conclude that McCannon's questioning was conducted in objectively reasonable reliance on our case law, so the good-faith

---

by that seizure would normally be tainted. However, if the defendant consents to the search after the stop is unlawfully prolonged but before the evidence is discovered, the consent can purge the taint. *See United States v. Santa*, 236 F.3d 662, 676–77 (11th Cir. 2000). To do this, the government must show (1) that the consent is voluntary and (2) that the consent is not a product of the illegal seizure. *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir. 2007). Since the evidence from McCannon's search is admissible under the good-faith exception, we are spared from conducting this analysis. And, for similar reasons, we need not reach the question of whether the consent issue is forfeited.

exception applies.  We thus decline to exclude the evidence uncovered during the search of Campbell's car, and the District Court's denial of Campbell's motion to suppress is affirmed.

**AFFIRMED.**

16-10128        WILLIAM PRYOR, C.J., Concurring        1

WILLIAM PRYOR, Chief Judge, Concurring:

I join the majority opinion in full, but I write separately to clarify some fundamental principles involving the en banc process, waiver, and the good-faith exception. In one sense, my dissenting colleagues are right to say that this appeal involves "judicial power and its limits." Dissenting Op. at 1. But they misunderstand in what way. This appeal concerns when the Judicial Branch should intervene on behalf of a criminal to exclude indisputably reliable evidence. And the result of this appeal is just: A criminal will receive the punishment that the district court decided he deserves without an unjustified exercise of judicial power by this Court.

As the majority understands, in an en banc rehearing, we review the judgment of the district court, as we have recognized in our previous en banc decisions. Majority Op. at 33–34; *see, e.g.*, *Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.4 (11th Cir. 2019) (en banc) ("We review a district court's grant of summary judgment *de novo*."); *SmileDirectClub, LLC v. Battle*, 4 F.4th 1274, 1277 (11th Cir. 2021) (en banc) (describing the en banc Court as "only hav[ing] jurisdiction over appeals from final decisions of the district courts." (internal quotation marks omitted)). We do not review the panel's decision. One of the reasons why we do not review the panel decision is that in the typical en banc rehearing, as here, we vacate the panel opinion when we grant rehearing en banc. 11TH CIR. R. 35-10 ("Unless otherwise expressly provided, the effect of granting a rehearing en banc is to vacate the panel opinion and the corresponding judgment."). And to vacate means "[t]o

2                 William Pryor, C.J., Concurring          16-10128

nullify or cancel; make void; [or] invalidate." *Vacate*, BLACK'S LAW
DICTIONARY (11th ed. 2019). Because of that vacatur, we cannot re-
view the panel decision, which no longer exists. We instead review
the judgment of the district court.

So, the majority is correct to hold both that the government
may properly raise alternative arguments in support of the district
court's judgment before the en banc court that it failed to raise be-
fore the panel and that the government has properly briefed the
good-faith exception to the en banc court. Majority Op. at 16 n.5.
This practice is permissible because, as a consequence of vacating
the panel's opinion, we review the issues anew after granting en
banc rehearing as if we were hearing the appeal directly from the
district court. This truth about the en banc process is widely recog-
nized. *See Socop-Gonzalez v. Immigr. & Naturalization Serv.*, 272
F.3d 1176, 1186 n.8 (9th Cir. 2001), *abrogated on other grounds by
Smith v. Davis*, 953 F.3d 582 (9th Cir. 2020) (en banc) ("[F]ailure to
raise an issue before an original appellate panel does not preclude
an *en banc* panel's jurisdiction over the issue. . . . The *en banc* court
does not review the original panel decision, nor does it overrule
the original panel decision. Rather, the *en banc* court acts as if it
were hearing the case on appeal for the first time."); 4TH CIR. R.
35(c) ("[T]he rehearing is a review of the judgment or decision
from which review is sought and not a review of the judgment of
the panel."); *see also, e.g.*, 18 JAMES WM. MOORE ET AL., MOORE'S
FEDERAL PRACTICE – Civil § 134.22[2][c] (3d ed. 2021); *Comer v.
Murphy Oil USA, Inc.*, 718 F.3d 460, 468 (5th Cir. 2013) ("Unless

16-10128          WILLIAM PRYOR, C.J., Concurring          3

otherwise expressly provided, the granting of a rehearing en banc vacates the panel opinion and judgment of the court . . . . Once the panel decision is vacated, it is of no precedential value." (internal quotation marks omitted)); 6TH CIR. R. 35(b) ("A decision to grant rehearing en banc vacates the previous opinion and judgment of the court . . . ."); 7TH CIR. OPERATING PROCEDURES 5(e) ("An order granting rehearing en banc should specifically state that the original panel's decision is thereby vacated."); *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (making clear that the Tenth Circuit, while sitting en banc, was reviewing the judgment of the district court). And the dissent cites no authority to the contrary.

The majority also correctly explains that the government never made any statement that could reasonably be understood to be an affirmative waiver of the good-faith exception. Majority Op. at 25–30. And the majority rightly addresses the reasons that we cannot rely on the inquisition at oral argument before the en banc court to determine whether a waiver occurred before the panel. *Id.* at 25–27. In addition, the dissent's reliance upon *Wood v. Milyard*, 566 U.S. 463 (2012), does not withstand scrutiny. Dissenting Op. at 38–39.

*Wood* does not support the dissent's reliance on the statements of the government at oral argument as evidence of a waiver. In *Wood*, the discussion of whether the State of Colorado waived a timeliness defense focused only on what the state said before the district court. 566 U.S. at 474. Nowhere in that decision did the

4                    William Pryor, C.J., Concurring            16-10128

Supreme Court discuss later representations at oral arguments or in briefs, by different attorneys, about the mental state of the attorney in the district court. *Id.* The Supreme Court instead looked only at the record. *Id.*; *accord Day v. McDonough*, 547 U.S. 198, 211 (2006) (explaining that "nothing *in the record* suggest[ed] that the State 'strategically' withheld [a] defense or chose to relinquish it," without reference to later characterizations of the mental state of the lawyer at the district court (emphasis added)).

Further, the dissent's view that "[t]he government's [statements at oral argument] bring[] this case squarely within the logic of *Wood*" stretches *Wood* beyond recognition. Dissenting Op. at 37–38. In *Wood*, the Supreme Court determined that Colorado had waived its timeliness argument by explicitly stating *in writing* that it would "not challenge" the timeliness of the habeas petition in both its preanswer response and its full answer to the habeas petition. 566 U.S. at 467 (internal quotation marks omitted). Unremarkably, the Supreme Court held that these statements constituted a waiver because they were "the intentional relinquishment or abandonment of a known right." *Id.* at 474 (internal quotation marks omitted). But no such statement occurred here. The government never disclaimed the good-faith exception. The government did not mention anything about the good-faith exception in its brief before the original panel. And it is settled law that when a party fails to raise an argument or issue in its brief, that argument or issue is only *forfeited*. Majority Op. at 21; *Kingdomware Techs., Inc., v. United States*, 136 S. Ct. 1969, 1978 (2016) (explaining that when a

16-10128        WILLIAM PRYOR, C.J., Concurring        5

party "fail[s] to raise [an] argument" the Supreme Court "normally decline[s] to entertain" it because it is "forfeited"); *see also* 16AA CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3974.3 (5th ed. Apr. 2021 update) ("[I]ssues omitted from the party's principal brief are ordinarily deemed forfeited."); *id.* § 3974.1 ("[T]here are many cases finding forfeiture where the contention was omitted from the brief . . . ."); *id.* § 3974.2 ("An appellee who fails to include and properly argue a contention in the appellee's brief takes the risk that the court will view the contention as forfeited.").

The majority opinion does an excellent job of articulating the requirement that the benefits of exclusion must outweigh the "substantial social costs." Majority Op. at 32 (internal quotation marks omitted). On this point, I add only that the facts in this appeal starkly present the costs of the exclusionary rule that must be outweighed. For example, in addition to the semi-automatic pistol and accompanying ammunition found in Campbell's car, Officer McCannon found a black stocking hat and camouflage face mask in the same bag as the gun. Officer McCannon thought that possession of these items evidenced that Campbell was "a person who might commit robberies." That inference seems reasonable to me, especially in the light of Campbell's prior conviction for armed robbery. "The principal cost" that must be outweighed by the deterrence value of exclusion is "letting guilty and possibly dangerous defendants" like Campbell, *Herring v. United States*, 555 U.S. 135, 141 (2009), "loose in the community without punishment," *Davis*

6                    William Pryor, C.J., Concurring                    16-10128

*v. United States*, 564 U.S. 229, 237 (2011). That "bitter pill" cannot be swallowed here, where Officer McCannon plainly acted in good faith. *Id.*

The dissent professes that it would exercise judicial restraint or "modest[y]" and accuses the majority of transgressing those principles. *See* Dissenting Op. at 59–62 (internal quotation marks omitted); *id.* at 1 ("This is a case about judicial power and its limits."). But reality is the opposite. The dissent would have this Court exercise extraordinary judicial power without justification.

The Supreme Court has explained that the exclusionary rule was "judicially created" and its application is an "extreme sanction." *Herring*, 555 U.S. at 139–40 (internal quotation marks omitted). So, the Supreme Court has "establish[ed] important principles that constrain [its] application." *Id.* at 140. One of those principles "limiting" the drastic remedy of exclusion is the good-faith exception. *United States v. Leon*, 468 U.S. 897, 923–24 (1984). And we are so limited here. This Court cannot, as a matter of limits on its power, "[r]esort to the massive remedy of suppressing evidence of guilt," *Hudson v. Michigan*, 547 U.S. 586, 599 (2006), where the "[e]vidence [was] obtained during a search conducted in reasonable reliance on binding precedent" because such evidence "is not subject to the exclusionary rule." *Davis*, 564 U.S. at 241.

The dissent asserts that applying the exclusionary rule here would conform with "the courts' traditional role as passive instruments of government." *See* Dissenting Op. at 59 (internal quotation marks omitted). But applying the exclusionary rule is anything

16-10128          WILLIAM PRYOR, C.J., Concurring          7

but passive. Excluding evidence that is plainly "not subject" to the rule because the officer acted in good faith would be an exercise of raw judicial power well beyond its established limits. *See Davis*, 564 U.S. at 241.

16-10128        Newsom and Jordan, JJ., Dissenting                1

Newsom and Jordan, Circuit Judges, with whom Wilson, Rosenbaum, and Jill Pryor, Circuit Judges, join, dissenting:

This is a case about judicial power and its limits.

## I

The factual and procedural history here is undisputed—and, for reasons that will become clear, important. Here's the short(ish) story: Nearly a decade ago now, Deputy Robert McCannon stopped Erickson Meko Campbell along I-20 in Greene County, Georgia. After an ensuing search of Campbell's car turned up a pistol and ammunition, he was arrested and subsequently indicted on a federal felon-in-possession charge.

Campbell moved to suppress the incriminating evidence on the ground that McCannon had conducted an "unreasonable . . . seizure[]" within the meaning of the Fourth Amendment. *See* U.S. Const. amend. IV. As particularly relevant here, Campbell contended that McCannon had unlawfully prolonged the traffic stop by asking questions unrelated to the stop's purpose, in violation of the Supreme Court's then-recent decision in *Rodriguez v. United States*, 575 U.S. 348 (2015). Following an evidentiary hearing, the district court sought and received supplemental briefing both on the effect of *Rodriguez* and separately—and significantly for our purposes—on the question whether, if a Fourth Amendment violation had occurred, the evidence was nonetheless admissible under the "good-faith exception" to the exclusionary rule as set out in *Davis v. United States*, 564 U.S. 229 (2011). In response, Campbell

reiterated his position that McCannon's detention of him violated the Fourth Amendment as interpreted in *Rodriguez* and argued, in addition, that the good-faith exception didn't apply. For its part, the government urged the district court to hold that McCannon's stop didn't violate Campbell's Fourth Amendment rights and, in the alternative, that the evidence should be admitted under the good-faith exception.

The district court denied Campbell's suppression motion, holding that this Court's decision in *United States v. Griffin*, 696 F.3d 1354 (11th Cir. 2012), rather than *Rodriguez*, governed the prolongation issue, and that under *Griffin*, because the overall length of the stop was reasonable, McCannon's seizure of Campbell was not unconstitutional. Because the court found no Fourth Amendment violation, it had no occasion to consider the government's backup argument that the evidence found in Campbell's car was admissible under *Davis*'s good-faith exception.

Campbell pleaded guilty but reserved the right to appeal the denial of his suppression motion. In his opening brief to this Court, Campbell insisted that *Rodriguez*, not *Griffin*, provided the applicable Fourth Amendment rule and that under *Rodriguez* the traffic stop and ensuing detention were unlawful. In its answering brief, the government contended *only* that McCannon's detention of Campbell comported with the Fourth Amendment. For reasons unexplained at the time—but that have since been described as the product of a "conscious" litigation decision—the government did *not* renew its separate argument (with respect to which,

significantly, it bore the burden of proof) that even if the detention violated the Constitution, the good-faith exception applied.

A three-judge panel of this Court unanimously concluded that Campbell was correct on the merits—*Rodriguez* governed the Fourth Amendment issue, and under that decision, McCannon had unlawfully prolonged the stop. *See United States v. Campbell*, 912 F.3d 1340 (11th Cir. 2019), *opinion vacated and superseded*, 970 F.3d 1342 (11th Cir. 2020), *reh'g en banc granted and opinion vacated*, 981 F.3d 1014 (11th Cir. 2020). But then, without giving the parties any notice of its intent to do so, without requesting supplemental briefing, and without even asking about the issue at oral argument, a divided panel held—as the government had *not* argued—that McCannon had reasonably relied on our pre-*Rodriguez* decision in *Griffin* and, accordingly, that the good-faith exception to the exclusionary rule applied. 912 F.3d at 1355–56. In so doing, the panel majority acknowledged the "[t]ypical" rule that a reviewing court "will not consider" a basis for affirmance that "an appellee waives or abandons," but nonetheless proceeded to decide the good-faith issue *sua sponte* on the grounds that "waiver is a prudential doctrine," that the parties had briefed the issue in the district court, and that "the applicability of the exception in this case is plain." *Id.* at 1355. Judge Martin dissented on the good-faith issue, maintaining that the panel majority shouldn't have invoked the exception because the government "never made that argument on appeal." *Id.* at 1356 (Martin, J., concurring in part and dissenting in part). In her view, an appellate court shouldn't be "in the business

of resuscitating arguments the government was made aware of, then clearly abandoned." *Id.* at 1358.

On its own motion, the panel vacated its opinion and issued a replacement in which the majority—again over Judge Martin's dissent—elaborated on its reasons for raising, considering, and deciding the good-faith issue *sua sponte*. *See Campbell*, 970 F.3d 1342. The panel majority acknowledged that "[t]he only way the Government could have raised the good-faith issue on appeal [was] by including it in its appellate brief" and assumed that the government had "waived the . . . issue by failing" to do so. 970 F.3d at 1357 & n.17. Even so, the majority repeated its refrain that "[w]aiver is a prudential doctrine" and, citing a law review article, added that an appellate court can decide for itself "[t]he degree to which [it] adhere[s] to the doctrine and the conditions under which [it] will excuse it." *Id.* at 1358. The majority swore off any "bright-line rule" and held, instead, that it could decide the good-faith issue *sua sponte* based on a handful of case-specific "policy considerations." *Id.* at 1358–59. In particular, the majority asserted (1) that the good-faith exception's applicability presented a "pure question of law," (2) that the good-faith issue was "resolved, as a matter of law, by [the court's] analysis of the constitutionality of McCannon's search," and (3) that because the government had raised the good-faith exception in the district court, "Campbell had notice that the issue was potentially relevant" on appeal notwithstanding the government's decision not to renew it. *Id.* at 1358–60.

★   ★   ★

16-10128        NEWSOM and JORDAN, JJ., Dissenting            5

Against that backdrop, this case presents the en banc Court with an important question of appellate procedure that, as it turns out, implicates dueling conceptions of judicial power:  Can an appellate court affirm a criminal defendant's conviction on a ground that, although argued to the district court, the government concedes it "conscious[ly]" decided not to present on appeal?  Doubling down on the panel's *sua sponte* consideration and decision of the good-faith issue, the majority concludes today that it can.

The Supreme Court recently—and unanimously—reiterated the elemental truth that "[i]n our adversarial system, we follow the principle of party presentation," pursuant to which "'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'" *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).  Accordingly, the Court emphasized, lower courts should be "passive" and "modest."  *Id.*  Today's decision is anything but—it contravenes foundational commitments of our adversarial system and its constituent party-presentation principle, obscures the critical distinction between the oft-confused concepts of "waiver" and "forfeiture," and fails to meaningfully limit the circumstances in which appellate courts can engage in what commentators have called "judicial issue creation."

We respectfully dissent.

## II

We begin, as we feel we must, with first principles—indeed, with the first principle of first principles:  In this country, we have an adversarial justice system.  *See, e.g.*, *Sineneng-Smith*, 140 S. Ct. at 1579 ("our adversarial system"); *Wood v. Milyard*, 566 U.S. 463, 472 (2012) ("our adversary system").  Unlike the judge-dominated inquisitorial systems of continental Europe and Latin America, an "adversary system relies on a neutral and passive decision maker to adjudicate disputes after they have been aired by the adversaries in a contested proceeding."  Stephen Landsman, *The Adversary System: A Description and Defense* 2 (1984); *accord, e.g.*, *Adversary System*, Black's Law Dictionary (10th ed. 2014) (defining "adversary system" as "[a] procedural system, such as the Anglo-American legal system, involving active and unhindered parties contesting with each other to put forth a case before an independent decision-maker").

Because this case puts core tenets of adversarialism to the test, it's worth exploring the subject in some detail.

## A

Adversarialism has deep historical roots that predate this country's founding.  Indeed, according to its foremost historian, the rudiments of the modern adversarial system can be traced to 11th-century England.  *See* Landsman, *Adversary System*, at 8.  In any event, "[f]rom the 1640s onward the full range of adversarial mechanisms began to grow, and by the end of the 1700s the

16-10128          NEWSOM and JORDAN, JJ., Dissenting          7

adversary system had become firmly established not only in England but in America, as well." *Id.* at 18–19; *see also, e.g.*, *id.* at 1 (noting that the adversarial system has been in place in this country "[s]ince at least the time of the American Revolution"); Judith Resnik, *Managerial Judges*, 96 Harv. L. Rev. 374, 380–81 (1982) (tracing adversarialism's history and observing that "[t]he limits placed on federal judges by the adversarial system comported with the views of those who drafted the Constitution").

One of the adversarial system's central features—particularly at issue in this case—is that "[t]he judge decides the case solely on the basis of the evidence and the arguments presented to him by the parties." Lon L. Fuller, *The Problems of Jurisprudence* 706 (1949). This "principle of party presentation," the Supreme Court has emphasized, is "basic to our adversary system." *Wood*, 566 U.S. at 472. As already noted, the Court recently, and heartily, endorsed the party-presentation principle in *Sineneng-Smith*. Its language there warrants quoting at some length:

> In our adversarial system of adjudication, we follow the principle of party presentation. As this Court stated in *Greenlaw v. United States*, 554 U.S. 237 (2008), "in both civil and criminal cases, in the first instance and on appeal . . ., we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.* at 243. In criminal cases, departures from the party presentation principle have usually occurred "to protect a *pro se* litigant's rights." *Id.* at 244. But

> as a general rule, our system "is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument[s] entitling them to relief."

140 S. Ct. at 1579 (cleaned up) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)).

"In short," the *Sineneng-Smith* Court summarized the party-presentation principle as follows: "'[C]ourts are essentially passive instruments of government.' They 'do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties.'" *Id.* (citation omitted) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of rehearing en banc)).

Adversarialism—and, in particular, its party-presentation principle—had no more ardent champion than the late Justice Scalia. While on the D.C. Circuit, then-Judge Scalia famously, and incisively, explained what he called "[t]he premise of our adversarial system": "[A]ppellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.). Once on the Supreme Court, he reiterated that position. For instance: "What makes a system adversarial rather than inquisitorial is . . .

16-10128　　　　Newsom and Jordan, JJ., Dissenting　　　　9

the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties." *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991) (Scalia, J.). And again: "The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one." *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring) (citing *United States v. Pryce*, 938 F.2d 1343, 1355 (D.C. Cir. 1991) (Silberman, J., dissenting in part)).

★　★　★

As these descriptions, odes, and homages make clear, adversarialism and the party-presentation principle exist, at their shared core, to protect and ensure judicial neutrality and humility. In an adversarial system, a court's principal role is not to declare law, to "do justice," or to maximize efficiency, but, rather, and simply, to resolve the specific disputes put before it by litigants and their lawyers. In an adversarial system—our system—courts are reactive, not proactive; passive, not aggressive; modest, not bold.

## B

Adversarialism and the party-presentation principle aren't just deeply historical, they're also instrumental to—and protective of—other core values of the Anglo-American judicial tradition. Among the fundamental interests that the adversarial system and

10          Newsom and Jordan, JJ., Dissenting          16-10128

its party-presentation requirement serve, courts and commentators have identified the following:

1. *Truth and Accuracy*—As the Supreme Court has repeatedly affirmed, adversarialism enhances the prospect that courts will render correct judgments: "[O]ur legal tradition regards the adversary process as the best means of ascertaining truth and minimizing the risk of error." *Mackey v. Montrym*, 443 U.S. 1, 13 (1979); *accord, e.g.*, *Penson v. Ohio*, 488 U.S. 75, 84 (1988) ("Th[e adversary] system is premised on the well-tested principle that truth—as well as fairness—is 'best discovered by powerful statements on both sides of the question.'"); *Polk County v. Dodson*, 454 U.S. 312, 318 (1981) ("The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness."); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 28 (1981) ("[O]ur adversary system presupposes [that] accurate and just results are most likely to be obtained through the equal contest of opposed interests . . . .").

2. *Fundamental Fairness*—Due-process protections apply in the courts, of course. *See, e.g.*, *Brinkerhoff-Faris Tr. & Sav. Co. v. Hill*, 281 U.S. 673, 678 (1930). To that end, the Supreme Court has observed that "[t]he opportunity to be heard is an essential requisite of due process of law in judicial proceedings." *Richards v. Jefferson County*, 517 U.S. 793, 797 n.4 (1996). The party-presentation principle serves due-process interests by ensuring that a party has advance notice and an opportunity to be heard before a court decides an issue that may sink his case. One commentator has explained the risk of abandoning party presentation this way:

16-10128        Newsom and Jordan, JJ., Dissenting        11

> When the appellate court considers a matter *sua sponte* for the first time it means that the litigants have not been given an opportunity to consider the matter and urge arguments in support of and against the position adopted by the reviewing court. If the question had been raised there is at least a possibility that other facts or other authorities might have been presented which might have changed the court's attitude on the matter. But this opportunity is not given to the losing party.

Allan D. Vestal, *Sua Sponte Consideration in Appellate Review*, 27 Fordham L. Rev. 477, 493 (1958).

3. ***Separation of Powers and Judicial Restraint***—Limiting courts to the issues that the parties put before them also minimizes the risk that judges become what commentators have called "policy entrepreneurs." Amanda Frost, *The Limits of Advocacy*, 59 Duke L. J. 447, 470 & n.91 (2009) (quoting Kevin T. McGuirre & Barbara Palmer, *Issue Fluidity on the U.S. Supreme Court*, 89 Am. Pol. Sci. Rev. 691, 699 (1995)). Indeed, as acknowledged by even the leading academic defender of what she calls "judicial issue creation," allowing unelected and unaccountable federal judges "to transgress the limits of the parties' arguments gives them the power to set their own agendas—a power normally reserved for the political branches." Frost, *Limits of Advocacy*, at 481.[1]

---

[1] In the same vein, Frost acknowledges that "[t]he norm against issue creation can even be said to have quasi-constitutional roots" in that "[i]t has at least a

4. ***Impartiality and Its Appearance***—Relatedly, "the adversarial method . . . emphasize[s] judges' disengagement as the means of achieving impartiality." Resnik, *Managerial Judges*, at 383 n.41. The reason is that "[w]hen litigants direct the proceedings, there is little opportunity for the judge to pursue his own agenda or to act on his biases." Landsman, *Adversary System*, at 44. Indeed, because under the party-presentation principle "the judge seldom takes the lead in conducting the proceedings, he is unlikely to appear to be partisan or to become embroiled in the contest." *Id.* at 44–45. Accordingly, the judge's detachment—his passivity—"preserves the appearance of fairness as well as fairness itself." *Id.* at 45.

By contrast, as we have observed, "[i]f a court engages in what may be perceived as the bidding of one party by raising claims or defenses on its behalf, the court may cease to appear as a neutral arbiter, and that could be damaging to our system of justice." *Burgess v. United States*, 874 F.3d 1292, 1300 (11th Cir. 2017). Accordingly, the party-presentation principle's opposite—the

---

passing relationship to Article III's case or controversy requirement, which limits courts to deciding disputes between parties with actual injuries that were caused by the legal wrong of which they complain and which are remediable by a court." Frost, *Limits of Advocacy*, at 460. In particular, she says that the "principle that the parties, and not the judge, should frame cases is grounded upon the same values as those underlying the doctrine of standing." *Id.* "Both promote separation of powers by preventing courts from setting their own agendas, as is the prerogative of the legislature. And both ensure that courts decide only those issues that are briefed and argued by stakeholders with an incentive to adequately represent their interests to the court, which in turn will produce better judicial decisions." *Id.*

16-10128         NEWSOM and JORDAN, JJ., Dissenting         13

aforementioned "judicial issue creation"—can breed suspicion and cynicism.  One critic, for instance, has worried that "courts are more likely to raise an issue sua sponte if they think a case is really important or if the judges really want to reach a particular result," and that "[t]he absence of a consistent principle leaves courts open to the accusation that ignoring the adversary process is a political action, where a court reaches out to legislate instead of following judicial norms."  Barry A. Miller, *Sua Sponte Appellate Rulings: When Courts Deprive Litigants of an Opportunity To Be Heard*, 39 San Diego L. Rev. 1253, 1260, 1287 (2002).  And as a descriptive matter, he says, both "side[s]" are guilty:  "[R]aising and deciding new issues is by no means limited to any one part of the political spectrum.  Liberal and conservative judges alike decide new issues *sua sponte*; each side complains when the other does it."  *Id.* at 1261.

5.  *Acceptance and Settlement*—Finally, adherence to the adversarial method and the party-presentation principle "promotes litigant and societal acceptance of decisions rendered by the courts."  Landsman, *Adversary System*, at 44.  The reason is that "if a party is intimately involved in the adjudicatory process and feels like he has been given a fair opportunity to present his case, he is likely to accept the results whether favorable or not."  *Id.*  By contrast, there is a risk that issue-creation—at least in its more extreme forms—may produce the opposite effect:  "If the grounds for the decision fall completely outside the framework of the argument, making all that was discussed or proved at the hearing

14              NEWSOM and JORDAN, JJ., Dissenting          16-10128

irrelevant . . . the adjudicative process has become a sham, for the parties' participation in the decision has lost all meaning." Lon L. Fuller, *The Forms and Limits of Adjudication*, 92 Harv. L. Rev. 353, 388 (1978).

★   ★   ★

Not at all surprisingly to us, this Court has made similar observations about the values of party presentation—and indeed, has done so in circumstances similar to those here. Like this case, *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316 (11th Cir. 2012), presented the question whether we should affirm a district court's judgment on a ground that the appellee hadn't properly presented in its principal brief. (Unlike the United States here, the appellee in *Hamilton* had at least *tried* to raise the alternative ground for affirmance, both in a supplemental brief and at oral argument. *See id.* at 1318–19.) We declined to venture beyond the issues squarely put before us and decide the issue *sua sponte*. In his opinion for the Court, Judge Ed Carnes underscored three of the fundamental interests served by careful adherence to party-presentation principles. First, truth and accuracy: "The requirement that issues be raised in a party's brief on appeal promotes careful and correct decision making." *Id.* at 1319. Second, fundamental fairness: The party-presentation rule "ensures that the opposing party has an opportunity to reflect upon and respond in writing to the arguments that his adversary is raising." *Id.* And third, judicial economy: "[I]t gives the appellate court the benefit of written arguments and provides the court and the parties with

16-10128        NEWSOM and JORDAN, JJ., Dissenting        15

an opportunity to prepare for oral argument with the opposing positions and arguments in mind." *Id.*

## C

To be fair, although rigorous adherence to the party-presentation principle is the entrenched norm in our adversarial system, there is a countervailing view. Commentators with a more expansive understanding of the judicial role have defended *sua sponte* decisionmaking—which they call "judicial issue creation." Frost, *Limits of Advocacy*, at 481. At the theoretical level, issue-creation advocates reject the "traditional" adversarial model of adjudication, which they see merely as "a vehicle for settling disputes between private parties about private rights," in favor of what they call a "public law" model, in which "the object of litigation is the vindication of constitutional or statutory policies." Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv. L. Rev. 1281, 1282-84 (1976). The judge, they say, is not just a decider of discrete cases; rather, she has the "responsibility . . . for organizing and shaping litigation to ensure a just and viable outcome." *Id.* at 1302. Although issue-creation advocates acknowledge that "dispute resolution may be one consequence" of adjudication, they insist that the true "function of the judge . . . is not to resolve disputes, but to give the proper meaning to our public values." Owen M. Fiss, *The Supreme Court, 1978 Term—Foreword: The Forms of Justice*, 93 Harv. L. Rev. 1, 30 (1979). There is a risk, they warn, that in pursuit of that lofty goal, a court could "be led into error" by the parties, who might "wittingly or unwittingly" compromise

broader social and political interests; accordingly, issue-creation advocates insist that it would be "almost absurd [for a court] to rely exclusively on the initiatives of those persons or agencies who happened to be named plaintiff and defendant." *Id.* at 25–26. The remedy, they contend, is *sua sponte* decisionmaking.

More practically, issue-creation advocates point to instances (1) in which the adversarial system might break down and (2) in which scrupulous adherence to a party-presentation requirement might lead courts to make bad law with potentially lasting downstream consequences. With respect to the former, they emphasize "the most persistent criticism of adversarial procedure—that it fails when the parties' skills and resources are not evenly matched." Frost, *Limits of Advocacy*, at 499. They insist that in order to achieve the objective of producing correct results—one of the leading justifications for adversarial procedure—"there must be at least a rough equality in the resources and presentation skills of the advocates for either party," which, they say, "all too often does not exist." *Id.* at 500. "When the resources and abilities of opposing parties are lopsided," they warn, "the adversarial system will fail to produce accurate results." *Id.* Stating the perceived risk in stark terms, they fear that "[t]he wealthier, sophisticated, repeat-player litigants will usually win [and] the poorer, outgunned, one-shot litigants will lose, regardless of the merit of their cases." *Id.* By raising and deciding issues *sua sponte*, issue-creation advocates say, judges can "ameliorate the imbalances that undermine the adversarial system." *Id.* at 501.

Separately, issue-creation advocates emphasize (as does the majority here, *see* Maj. Op. at 33–36) the courts' *Marbury*-prescribed duty to "say what the law is," and to do so accurately—in short, to "get it right." *See* Frost, *Limits of Advocacy*, at 471 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). "When the parties fail to fully and accurately describe applicable legal standards," they say, "the norm against judicial issue creation comes into conflict with the judiciary's law pronouncement power." *Id.* at 472. To underscore their point, issue-creation advocates advert to two notable instances in which the Supreme Court decided monumental constitutional issues *sua sponte*. First, in *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), the Court overruled its earlier decision in *Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842), and held that federal courts lacked the authority to craft "federal general common law"—despite the fact that no party had asked it to do so. Second, in *Washington v. Davis*, 426 U.S. 229 (1976), the Court rejected the parties' shared assumption that the Equal Protection Clause barred even unintentional race discrimination and held, *sua sponte*, that the Clause prohibits only conduct motivated by discriminatory animus. Both *Erie* and *Davis*, the issue-creation advocates say, "can be understood as judicial efforts to avoid issuing erroneous statements of law." Frost, *Limits of Advocacy*, at 473.

It is "particularly important that [courts] make accurate statements about the meaning of law," issue-creation advocates contend, "because federal judges operate within a common law system in which the precedent in one case establishes the law for

18            Newsom and Jordan, JJ., Dissenting         16-10128

all who follow." *Id.* at 453.  Given that reality, they warn that rig-
orous adherence to a party-presentation requirement could perpet-
uate error:  "[I]f litigants fail to fairly, completely, and accurately
describe the law, judicial opinions may themselves contain flawed
statements of law that will bind all who come after." *Id.* at 492.
Accordingly, issue-creation advocates insist that "[i]n a legal system
in which appellate opinions not only establish the meaning of law,
but do so through precedent that binds future litigants, courts can-
not cede to the parties control over legal analysis." *Id.* at 453.

　　　　We will consider below whether these (or other) concerns
warrant a departure from the usual rule of party presentation—and
thus justify issue-creation—in this case.  *See infra* at 58–68.  At the
risk of spoiling the surprise, they don't.

★　★　★

　　　　That's quite a wind-up, we recognize.  The point is simply
that the party-presentation principle is part and parcel of the adver-
sarial system, which, in turn, is part and parcel of the American ju-
dicial tradition.  Proponents of *sua sponte* decisionmaking—*i.e.,*
"judicial issue creation"—thus bear the heavy burden of demon-
strating its propriety.  We turn next to the circumstances in which
*sua sponte* decisionmaking is—and most certainly is not—permis-
sible, and explain why this case, no matter how understood, falls
on the wrong side of that line.

16-10128        NEWSOM and JORDAN, JJ., Dissenting        19

### III

Despite adversarialism's pedigree, and the important values it serves, all agree that "[t]he party presentation principle" is "not ironclad." *Sineneng-Smith*, 140 S. Ct. at 1579. "There are no doubt circumstances in which a modest initiating role for a court is appropriate." *Id.* The question this case presents is when, and under what circumstances, a court should raise and decide an issue that the parties haven't presented. More particularly, and to use the Supreme Court's words, the question is whether the Court here has acted in an appropriately "neutral," "passive," and "modest" fashion by *sua sponte* raising, considering, and deciding the applicability of the good-faith exception to the exclusionary rule. *See id.*

### A

In order to decide that question, we must first carefully differentiate two related-but-distinct concepts: "waiver" and "forfeiture." As the majority opinion correctly observes, "jurists sometimes"—but mistakenly and confusingly—"use the words interchangeably." Maj Op. at 18. Indeed, nowhere is that confusion more evident than in the procedural history of this case. In both of its opinions, for instance, the panel majority repeatedly characterized the government's non-argument of the good-faith issue as a "waiver"—holding that even though the government had "waived" the issue, the court could nonetheless reach it because "[w]aiver is a prudential doctrine." *Campbell*, 970 F.3d at 1357, 1358, 1359, 1359 n.20, 1359 n.21, 1360; *Campbell*, 912 F.3d at 1355. And yet today, in vindicating the panel's decision, the en banc

majority repeatedly asserts, to the contrary, that the case has *noth-ing* to do with waiver and that, instead, the government's non-argument constitutes a mere "forfeiture."  Maj. Op. at 16 n.5, 17, 21, 25 & n.11, 29, 30, 31, 33, 36.[2]

So, to set the record straight, "[t]he terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous." *Hamer v. Neighborhood*, 138 S. Ct. 13, 17 n.1 (2017).  Forfeiture, on the one hand, "is the failure to make the timely assertion of a right," while waiver, on the other, is the "intentional relinquishment or abandonment of a known right." *Id.* (citations and quotation marks omitted).  On this much, at least, we agree with our colleagues in the majority:  Both in the law

---

[2] Before getting in too deep, a brief word in response to Chief Judge Pryor's separate concurrence, which faults us for—in his words—"review[ing] the panel's decision." Pryor Concurring Op. at 1.  The Chief is of course correct that the en banc court doesn't technically sit to review a three-judge panel's decision.  Rather, the full court convenes to decide "question[s] of exceptional importance," Fed. R. App. P. 35(a)(2)—and, having done so, often remands the balance of the case to the panel for application or resolution of other issues, *see, e.g.*, *Lewis v. City of Union City*, 918 F.3d 1213, 1231 n.20 (11th Cir. 2019) (en banc); *Ovalles v. United States*, 905 F.3d 1231, 1236 n.2, 1253 (11th Cir. 2018) (en banc); *United States v. Stein*, 881 F.3d 853, 859 (11th Cir. 2018) (en banc).  To that end, we typically direct the parties to brief and argue a discrete question of law.  That question here (with our emphasis) was as follows:  "Is the good-faith exception to the exclusionary rule a proper ground for affirming Campbell's conviction despite the government's failure to raise that alternative ground *before the panel*?"  It should go without saying that the answer to that question—which we framed—requires an analysis of the panel-stage proceedings.

16-10128          NEWSOM and JORDAN, JJ., Dissenting          21

generally and in this case particularly, the distinction between waiver and forfeiture "matters." Maj. Op. at 18. Let us explain.

## B

The Supreme Court's decision in *Wood v. Milyard*, 566 U.S. 463 (2012), illustrates the waiver-forfeiture distinction in operation. In *Wood*, a convicted murderer sentenced to life in state prison filed a federal habeas petition. In the district court, the state declined to press the argument that the petition was untimely, twice informing the court that while it did not "conced[e]" timeliness, it would not "challeng[e]" the petition on that basis. *Id.* at 467. Consistent with the state's litigating position, the district court passed over the timeliness issue and dismissed some of the petitioner's claims for failure to exhaust and others on the merits. *See id.* On appeal, though, the Tenth Circuit raised the timeliness issue on its own and directed the parties to brief it alongside the merits. *See id.* at 467–68. Notably for present purposes, the Tenth Circuit did so for some of the same reasons that the majority here justifies *sua sponte* decisionmaking—namely, (1) because an appellate court "ha[s] discretion to affirm on any ground adequately supported by the record" and (2) because, in essence, case-specific considerations favored forging ahead to consider and decide the issue. *Wood v. Milyard*, 403 F. App'x 335, 337 n.2 (10th Cir. 2010) (citation and quotation marks omitted), *rev'd*, 566 U.S. 463; *see also* Maj. Op. at 33–36.

In reversing the Tenth Circuit's decision, the Supreme Court drew a sharp contrast between issues that are inadvertently

"forfeited" and those that are deliberately "waived." Relying on its earlier decision in *Granberry v. Greer*, 481 U.S. 129 (1987), the Court acknowledged that there is no *per se* "bar to court of appeals' consideration of a *forfeited* habeas defense." *Wood*, 566 U.S. at 471 (emphasis added). Even so, the Court stressed, an appellate court's power to consider forfeited arguments—including those made by state governments in habeas proceedings, in which states are typically entitled to the benefit of the doubt—is narrowly limited. Specifically, the Court repeated its earlier holding that "federal appellate courts have discretion, in 'exceptional cases,' to consider" arguments that the state has "'inadvertent[ly]' overlooked." *Id.* (quoting *Granberry*, 481 U.S. at 132).

Even more importantly for present purposes, though, the Court emphasized in *Wood* that "a federal court does not have *carte blanche* to depart from the principle of party presentation basic to our adversary system." *Id.* at 472 (citation omitted). In particular, quoting its intervening decision in *Day v. McDonough*, 547 U.S. 198 (2006), the Court stated, as relevant here, that a federal court can raise and decide an issue *sua sponte* "[o]nly where the State [has] not 'strategically withh[e]ld . . . or chose[n] to relinquish'" it, and reiterated *Day*'s observation that "[i]t would be 'an abuse of discretion' . . . for a court 'to override a State's deliberate waiver'" of a habeas defense. *Wood*, 566 U.S. at 472–73 (quoting *Day*, 547 U.S. at 202, 211). Accordingly, the Court clarified, the power to act *sua sponte* extends *only* to instances of "inadvertent error"—*not* to those in which the party defending the lower court's

judgment has made a "deliberate decision" to jettison an alternative basis for affirmance. *Id.* at 473 (citation and quotation marks omitted).

The Court in *Wood* held that the state had consciously *waived*—rather than inadvertently *forfeited*—its timeliness argument. The state, the Court said, "was well aware of the statute of limitations defense available to it and of the arguments that could be made in support of the defense." *Id.* at 474. Although it had a "clear and accurate understanding of the timeliness issue," the state "deliberately steered" the lower court away from that ground and toward the merits. *Id.* Because, in doing so, it had "intentional[ly] relinquish[ed] or abandon[ed] a known right"—and thus committed waiver, rather than mere forfeiture—the Supreme Court held that the Tenth Circuit had erred in *sua sponte* raising and considering the timeliness issue. *Id.* (citation and quotation marks omitted).

Whatever *Wood*'s outer boundaries—whether, for instance, it is properly read (as it seems) to establish a categorical prohibition—it is undeniable that a federal court's *sua sponte* consideration and decision of an issue that a party has deliberately waived represents a far greater departure from (and affront to) the adversarial process than does a court's *sua sponte* consideration and decision of an issue that has been merely forfeited. The reason is obvious: If the party presentation and control of litigation that is adversarialism's hallmark means anything at all, surely it means that a court—by design, a "passive instrument[] of government,"

*Sineneng-Smith*, 140 S. Ct. at 1579—shouldn't countermand a litigant's conscious choice about how best to frame its case.

Accordingly, in deciding whether a court has acted appropriately "modest[ly]" in raising, considering, and deciding an issue *sua sponte*, *see id.*, it is important to determine first—at the outset—whether, in so doing, it has overridden a deliberate waiver or merely forgiven an inadvertent forfeiture.

## C

To its credit, the majority seems to agree. Acknowledging the Supreme Court's holding in *Wood* that "[i]t would be 'an abuse of discretion' . . . for a court 'to override a State's deliberate waiver,'" *Wood*, 566 U.S. at 472–73 (quotations omitted), the majority concedes that "if a party affirmatively and intentionally relinquishes an issue, then courts must respect that decision"—full stop. Maj. Op. at 19–20. To the contrary, the majority says—correctly, and again quoting *Wood*—that an appellate court has limited authority to "'resurrect'" a forfeited issue provided that "'extraordinary circumstances'" warrant doing so. *Id.* at 20 (quoting *Wood*, 566 U.S. at 471 & n.5). So there seems to be raging consensus about the governing principles here: If the government *waived* the good-faith issue by opting not to pursue it before the panel, then it's off the table. If, instead, the government merely *forfeited* the good-faith issue, then the Court can reach and decide it upon a showing of "extraordinary circumstances."

16-10128        NEWSOM and JORDAN, JJ., Dissenting        25

The pivotal question, then:  Is this a waiver case or a forfeiture case?  As already noted, the panel majority (repeatedly) called the government's non-argument of the good-faith exception a "waiver."  Today's majority, by contrast, insists that this case involves only a "forfeiture."  *See id.* at 25.  In particular, the en banc majority says (1) that "the mere failure to raise an issue in an initial brief on direct appeal should be treated as a forfeiture of the issue," not a waiver, *id.* at 21, and (2) that because the government here simply "failed to brief the good-faith exception on appeal," its good-faith argument was only "forfeited," *id.* at 25.  With the first part of the majority's argument, we can agree:  A "mere failure" to brief an issue constitutes a forfeiture, and so long as "extraordinary circumstances" exist, an appellate court can consider the issue *sua sponte*.  But with the second part—that a "mere failure" is all that occurred here—we strongly disagree.

1

Tellingly, the majority never really explains *why* it thinks the government's non-argument of the good-faith issue resulted from a "mere failure."  It just repeatedly asserts that proposition as fact, as if hoping to speak it into existence.  *See, e.g., id.* at 14 (referring to "the Government's failure to address the matter on appeal"); *id.* at 15 ("Government's failure"); *id.* at 17 ("Government's failure"); *id.* at 21 ("mere failure"); *id.* at 22 ("failure"); *id.* at 23 ("failure to brief"); *id.* at 25 ("The Government failed to brief the good-faith exception on appeal."); *id.* at 29 ("the mere failure of the Government"); *id.* at 30 ("the mere failure to brief an issue").  In

26              NEWSOM and JORDAN, JJ., Dissenting              16-10128

the same vein, the majority repeatedly asserts—without elabora-
tion—that the government "merely made a mistake by failing to
brief the good-faith exception." *Id.* at 29; *see also id.* at 33 (referring
to "Government counsel's mistake[]").

    For reasons we will explain in due course, even if the major-
ity's premise were correct—*i.e.,* even if this case involved a "mere
failure," and thus a forfeiture—its conclusion that *sua sponte* con-
sideration of the good-faith issue is proper would be wrong. *See
infra* Part IV. In fact, though, its premise is wrong—dead wrong.
The record here demonstrates beyond any doubt whatsoever that
the government consciously, intentionally, and deliberately
*waived* its position that the good-faith exception justified admis-
sion of the evidence seized from Campbell's car. Indeed, the gov-
ernment has admitted as much—the majority just refuses to hear
it. Here are the details.

    In its en banc brief, the government acknowledged what we
all know to be true—that "the Department of Justice may, in some
cases, make a deliberate decision not to assert an available ground
for affirmance." En Banc Br. of the United States at 28.[3] Without
coming right out and saying so, though, the government then

---

[3] For instance, the government might opt not to assert a good-faith argu-
ment—or another applicable exception to the exclusionary rule—because it
wants a definitive determination about the constitutionality of a particular po-
lice practice. Were it to assert the good-faith (or some other) exception, it
would give the court an opportunity to bypass the constitutional question,
thereby leaving prosecutors and law-enforcement officers guessing.

suggested—albeit elliptically—that perhaps (?) that wasn't the case here: "[L]ike any litigant," it said, "the government is fallible and sometimes omits, *unwittingly*, a dispositive argument for affirming." *Id.* at 31 (emphasis added); *accord id.* at 1, 12, 21 (same). The majority seems to take the latter statement as a representation that, in fact, in this case, the government simply "fail[ed]" to argue good faith—*i.e.*, that it just made an honest "mistake."

But there's *so* much more to the story. Given the obscurity of the government's briefing—and in an effort to get to the bottom of the waiver-forfeiture issue—several members of the Court sought to clarify at the en banc oral argument precisely what underlay the government's non-argument of the good-faith issue before the panel. An extended colloquy ensued. For the sake of completeness, we reproduce the pertinent portions of that colloquy below. But we won't bury the lede. At the end of the day, the government's lawyer candidly—if grudgingly—acknowledged that, in fact, the government's non-argument of the good-faith issue was *not* "unwitting[]" or inadvertent but, rather, was the product of a "conscious" litigation decision.

At the outset of the government's argument, one judge asked the government's lawyer about his brief's insinuation—again, it wasn't quite a representation—that the omission of the good-faith issue from the government's panel-stage brief had been "unwitting[]." This exchange followed:

> **JUDGE NEWSOM**: Are you representing, as an officer of the court, that the decision not to brief the

good faith exception before the panel was inadvertent? That's a little hard for me to believe given the scrum over it [*i.e.,* the amount of attention given to the good-faith issue] in the district court.

GOVERNMENT: Your honor, we are not representing that it was inadvertent in the sense that we were not aware of the existence of the good-faith issue in the district court. What I can say is that it was a mistake not to brief it and that we posed perhaps unwarranted overconfidence, as this court recently said in a different case, in the strength of our own merits argument.

CHIEF JUDGE PRYOR: Is that a way of saying that it was not a conscious decision not to assert it?

GOVERNMENT: I would say it was not a strategic decision to avoid resolution of the appeal on the basis of the good-faith exception.

JUDGE MARTIN: What happened? What happened? I mean, you say 'unwittingly.' ★ ★ ★ Did you just forget about it? I mean, you had already argued in the district court . . . asking the district court not to decide [the case] on that basis. So, what happened?

GOVERNMENT: To be clear, in the district court, I would like to be very clear about this, when we were asked about supplemental briefing with respect to the good-faith exception, we took a position that the good-faith exception applied, if necessary. When we

16-10128        NEWSOM and JORDAN, JJ., Dissenting        29

asked the district court not to resolve the issue on that ground, what we said, what we argued, was that we won on the merits, which is exactly the same position that we asserted on appeal.  Now, the district court didn't reach that issue . . . .

**JUDGE MARTIN**:  No, I know—so, what do you mean when you say you 'unwittingly' omitted the argument from your brief to this court?  What happened?

**GOVERNMENT**:  Precisely as I was explaining just a minute ago, the district court did not issue a decision on the good-faith exception.  We were confident that we . . . would be able to prevail based on the binding precedent of this court at the time, *Griffin*, and we did not think it was necessary to add another [argument].

**JUDGE MARTIN**:  So it was not unwitting.  It was an affirmative decision.

**JUDGE NEWSOM**:  It was a conscious decision.  In answer to . . . Chief Judge Pryor's question, it was a conscious decision not to brief it.  You just thought you had a winner at step one.

**GOVERNMENT**:  It was conscious, yes, it was conscious—again, I don't want to get lost in sort of a linguistic battle about conscious as opposed to unwitting.  What I can say is that there was no strategic attempt to avoid a decision based on the good-faith exception.  That issue was not resolved by the district

30          NEWSOM and JORDAN, JJ., Dissenting          16-10128

>court [and] we thought we had [a] plenty good argu-
>ment on the merits and that's the argument that we
>asserted on appeal.

En Banc Oral Arg. at 17:30–20:10.

The upshot of that colloquy is unmistakable.  The govern-
ment has (1) conceded that the omission of the good-faith argu-
ment from its panel-stage brief *was not* "unwitting[]" or inadvert-
ent, (2) conceded, to the contrary, that the omission *was* "con-
scious," and (3) argued only that the omission wasn't "strategic."
The government's concessions—which, as the exchange makes
clear, were fully and fairly probed, tested, and explained—conclu-
sively establish that its non-argument of the good-faith issue re-
sulted from *waiver*, not mere forfeiture.  The government here
didn't just "fail[] to make the timely assertion" of its good-faith ar-
gument; rather, it "intentional[ly] relinquish[ed] or abandon[ed]"
that argument.  *Hamer*, 138 S. Ct. at 17 n.1 (citations and quotation
marks omitted).

**2**

Our colleagues in the majority are understandably sensitive
about the oral-argument exchange, and they've chided us for rely-
ing on it, going so far as to characterize the questioning of the gov-
ernment's lawyer as an exercise in courtroom "antics," Maj. Op. at
27, and an "inquisition," Pryor Concurring Op. at 3.  Those are
strong words, so let us briefly address the objections.

16-10128        Newsom and Jordan, JJ., Dissenting                31

### a

"[M]ost egregious[ly]," the majority charges, "the dissent"—
by which it presumably means some or all the judges that later
joined this opinion—"essentially conducted an evidentiary hearing
at oral argument." Maj. Op. at 26. It would have been perfectly
permissible, the majority reasons, for a member of this Court to
ask the government's lawyer whether the United States was "waiv-
ing or ha[d] waived" the good-faith issue—and, indeed, to treat any
affirmative answer to that question as a binding concession. *Id.*
But, the majority complains, "the dissenting judges" didn't "pursue
this route" but, rather, set out "to elicit evidence"—and "sought
testimony"—about the government's "knowledge and intentions"
by asking whether its non-argument of the good-faith issue before
the panel was "unwitting" and "inadvertent" or, instead, "con-
scious." *Id.* at 26–27.

A few responses: First, aren't we slicing the bologna a little
thin? Can it really be that it would have been okay to inquire
whether the government had "waived" the good-faith issue, but
that asking whether its non-argument was "conscious" or inten-
tional is somehow verboten? Remember that for better or worse,
the Supreme Court has focused on intentionality in distinguishing
between waiver and forfeiture: Again, in the Court's words,
waiver results from an "intentional relinquishment," forfeiture
from an inadvertent "failure." *Hamer*, 138 S. Ct. at 17 n.1 (quota-
tion marks omitted). So it seems to us that the questions, "Did you
waive the good-faith issue?" and "Did you make a conscious

32          NEWSOM and JORDAN, JJ., Dissenting          16-10128

decision not to assert the good-faith issue?" are, in effect, one and the same. The logic of the majority's contrary view—which seems to rest on some sort of magic-words formalism—escapes us.[4]

Second, and to be absolutely clear, it wasn't just "the dissenting judges" who joined in the so-called "antics." The oral-argument questioning was no sinister plot—no cabal-led gotcha game. After all, it was Chief Judge Pryor, who not only joins today's majority opinion but has also filed a separate concurrence to underscore his objection to what he calls the in-court "inquisition," Pryor Concurring Op. at 3, who asked the dispositive question—namely,

---

[4] Regardless, it wasn't *just* the government's use of the word "conscious" that established the requisite intentionality. If the government's non-argument of the good-faith exception before the panel had actually been inadvertent, its repeated in-court statements that it didn't brief the issue because it was "confident" (even "overconfiden[t]") in its merits arguments, *see* En Banc Oral Arg. at 18:15–19:30, wouldn't have made any sense. A party's "confiden[ce]" in one position can't, as a matter of logic, cause it to *accidentally* omit some other position.

It's also important to note that while the government's responses to the Court's questions in this case expressly confirmed its earlier waiver, "a valid waiver"—even when a constitutional right is on the line—"need not be express." *Hemphill v. New York*, 142 S. Ct. 681, 694 (2022) (Alito, J., joined by Kavanaugh, J., concurring). Rather, an "[i]mplied waiver can be established through 'a course of conduct' even 'absent formal or express statements of waiver.'" *Id.* (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 383–84 (2010)). Indeed, "'[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.'" *Id.* (quoting *Berghuis*, 560 U.S. at 385).

16-10128        Newsom and Jordan, JJ., Dissenting        33

whether the government had made a "conscious decision not to assert" the good-faith exception, En Banc Oral Arg. at 18:15–18:20.

Finally, and relatedly, let us not forget that it was the government's vague suggestion in its en banc brief—that having argued the good-faith exception in the district court, at that court's express direction, it had somehow "unwittingly" failed to renew that position before the panel—that prompted the oral-argument colloquy in the first place. *See* En Banc Br. of the United States at 31; *accord id.* at 1, 12, 21. It seems to us that given the underlying law—which, again, asks courts to draw the waiver-forfeiture distinction by looking to intentionality—and the haziness of the government's briefing, the members of the en banc court had not just a right but also an obligation to probe the circumstances surrounding the government's non-argument. To the extent that the majority means to suggest that the members of this Court simply had to take at face value—and without question—the government's dubious (and as it turns out erroneous) insinuation that its non-argument of the good-faith exception was the product of an inadvertent mistake, we'll just have to agree to disagree.

b

The majority separately objects on the ground that the oral-argument colloquy simply isn't probative with respect to the waiver-forfeiture distinction—that our reliance on it is just "unpersua[sive]." Maj. Op. at 28. The reason, the majority says, is that the lawyer who presented the government's case before the en banc court, Mr. Francesco Valentini, didn't author the

34          NEWSOM and JORDAN, JJ., Dissenting        16-10128

government's panel-stage brief and didn't enter an appearance in the case until shortly before en banc rehearing was granted. *See id.* at 28. Accordingly, the majority concludes, "[a]ny information he may have had about the panel brief writer's knowledge or intentions would be hearsay." *Id.*

We have two responses: First, and we think significantly, Mr. Valentini didn't appear before the en banc court as a lawyer for a private litigant, let alone as a "witness" offering after-the-fact "testimony" about the panel-stage brief-writer's state of mind. *See id.* at 26, 27 n.12, 28 n.13, 29. Rather, as his opening statement explained, he appeared as counsel "for the United States." En Banc Oral Arg. at 16:18–16:28. Like all government lawyers who come before us, he claimed—quite properly—the authority to speak on behalf of the sovereign itself. *Cf.* 28 U.S.C. § 517 (noting that lawyers designated by the Attorney General shall "attend to the interests of the United States").

Second, while Mr. Valentini didn't author the government's panel-stage brief, which omitted any discussion of the good-faith issue, he *did* author the government's en banc brief, which repeatedly (but elliptically) suggested that "the government"—again, not the panel-stage brief's author, but "the government" itself—had only "unwittingly" neglected to address good faith. To his considerable credit, when he was asked to explain that suggestion, and was pressed about the specifics of government's decision not to argue the good-faith exception, Mr. Valentini represented—not only as an agent of the United States but also as an officer of the court—

16-10128        Newsom and Jordan, JJ., Dissenting        35

that it was made "conscious[ly]." En Banc Oral Arg. at 19:50–19:55. The majority just refuses to take his word for it.

c

The majority's final colloquy-related charge is that we have ignored "the Government's" statements—by which it quite rightly means Mr. Valentini's statements for the United States—that "it"—again, the government itself—"did not make a 'strategic' decision not to brief the good-faith exception." Maj. Op. at 29. Wrong. We're willing to take those protestations at face value.[5] The problem for the majority, with which it never contends, is that by dint of binding Supreme Court precedent, those protestations *are legally irrelevant*. As already explained, echoing its earlier decision in *Day*, the Supreme Court in *Wood* emphasized that a federal court can depart from the party-presentation principle and consider and decide an issue *sua sponte* "[o]nly" when the non-arguing litigant has not *either* "'strategically withh[e]ld . . . *or* chose[n] to relinquish it.'" *Wood*, 566 U.S. at 472 (quoting *Day*, 547 U.S. at 211) (emphasis added). "Intentional"—or to use the government's word, "conscious"—relinquishment constitutes waiver, whether

_____

[5] In all honesty, though, we struggle to understand how a litigant's (or its lawyer's) decision to drop one position in favor of another in which it (or he or she) has more "confiden[ce]" is anything other than a "strategic" decision. *Cf. Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."); *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (characterizing as a "sound strategic" judgment a lawyer's decision to "forgo" an argument that he had employed "as a trial defense").

36          NEWSOM and JORDAN, JJ., Dissenting          16-10128

or not motivated by "strategic[]" considerations.  *Id.* at 472, 474
(quotation marks omitted).[6]

★  ★  ★

With all its talk of "antics," "inquisitions," and faux "eviden-
tiary hearings," the majority seems to want to complicate—and ob-
scure—a very straightforward event, which surely resembles simi-
lar events that occur in courtrooms around this country every day.
The government's en banc brief repeatedly—but vaguely—insinu-
ated that it had "unwittingly" failed to argue the good-faith excep-
tion in its panel brief.  Knowing that the case could turn on the
distinction between waiver and forfeiture, and that the waiver-

---

[6] Before we move on, one last colloquy-related item:  The majority's vague
suggestion that the government should be forgiven because, in opting not to
argue the good-faith exception before the panel, it was merely "attempting to
follow the Supreme Court's advice on appellate briefing" by narrowing the
issues "'in the limited number of pages allowed,'" Maj. Op. at 23 (quoting
*Jones v. Barnes*, 463 U.S. 745, 752 (1983)), does not withstand even minimal
scrutiny.  As an initial matter, it is descriptively inaccurate.  Immediately after
the oral-argument exchange already quoted, Mr. Valentini was asked the fol-
lowing friendly question:  "Are you saying that you only had . . . however
many pages, and you wanted to spend your pages on the merits rather than
on [the good-faith] exception—is that essentially what you're saying?"  En
Banc Oral Arg. at 20:15–20:26.  Again, to his credit, Mr. Valentini declined the
lifeline:  "Well, I don't think we were quite up against the word limit, which
is generous."  *Id.* at 20:26–20:29.  Moreover, and in any event, the majority's
suggestion boomerangs back around on itself, as "select[ing] the issues to be
argued on appeal," Maj. Op. at 23 (quoting *Johnson v. Alabama*, 256 F.3d 1156,
1188 (11th Cir. 2001)), is precisely the sort of "strategic" judgment that the
majority insists the government *didn't* make.

16-10128        NEWSOM and JORDAN, JJ., Dissenting        37

forfeiture distinction itself turns on questions about a party's intent, several judges—some now in the majority, some now in dissent—sensibly sought to clarify the government's position at oral argument. Was the government's decision truly "unwitting"—"inadvertent"—or was it instead "conscious"? In answer to the Court's questions, the government's lawyer gave a candid answer: The decision was conscious. It really is as simple as that.[7]

The majority's stubborn insistence—in the face of the government's in-court concessions—that this case involves mere forfeiture rather than intentional waiver, *see* Maj. Op. at 17–36, only underscores (and exacerbates) the anti-adversarialism of its approach. This Court has now stepped in to rescue the government not just once but twice: as an initial matter, from its non-argument of the good-faith issue, and now, from the consequences of its admission that it deliberately decided not to press a good-faith-based ground for affirmance. That is the polar opposite of "neutral," "passive," and "modest." *Sineneng-Smith*, 140 S. Ct. at 1579 (quotation marks omitted).

**3**

The government's on-the-record concession that it "conscious[ly]" decided to jettison the good-faith issue before the panel

_____

[7] We urge any remaining skeptics to listen to the oral-argument recording for themselves. *See* United States Court of Appeals for the Eleventh Circuit, Oral Argument Recordings, *United States v. Campbell*, No. 16-10128 (June 15, 2021).

brings this case squarely within the logic of *Wood*, which (again) held that while a court of appeals has some discretion to take up *sua sponte* a forfeited issue, it "abuse[s that] discretion" when it overrides a litigant's "deliberate waiver" of a potentially winning argument—even, to repeat, when the "waiv[ing]" party is a state government in a federal habeas corpus proceeding, in which states are typically entitled to a healthy dose of deference. *See* 566 U.S. at 472–73. Indeed, the government's only explanation here for its decision not to press the good-faith exception—"we thought we had [a] plenty good argument on the merits," En Banc Oral Arg. at 20:05–20:10—mirrors *precisely* the state's (losing) position in *Wood*. Just like the state there, the government here had a "clear and accurate understanding" of an additional argument for affirmance, but opted to "refrain" from making that argument and, instead, to "deliberately steer[]" the court "towards the merits." 566 U.S. at 474.[8]

---

[8] For his part, Chief Judge Pryor seeks to distinguish *Wood* on the grounds that the Supreme Court in that case (1) focused on what was said "before the district court," rather than on appeal, (2) didn't point to statements made by "different attorneys" than those whose conduct constituted the alleged waiver, and (3) determined that the lawyers in that case had waived the pertinent position "in writing." Pryor Concurring Op. at 3–4 (emphasis omitted). To the extent that the Chief means to say that a newly retained or designated lawyer can never waive an issue during an appellate argument, the en banc majority disagrees with him. *See* Maj. Op. at 24 (acknowledging that "a party can of course choose to waive its rights at any time," including "on appeal," provided that it does so "through a clear, affirmative statement"). And correctly so; even a cursory search of this this Court's decisions reveals that, in

16-10128        NEWSOM and JORDAN, JJ., Dissenting        39

Under *Wood*, and in the particular (and perhaps particularly odd) circumstances of this case, the result is clear:  Because the government deliberately—to use its word, "conscious[ly]"—waived its good-faith argument, it was, and remains, an "abuse of discretion" to raise, consider, and decide that issue in its favor *sua sponte*.  566 U.S. at 472–73.  That should be the end of the matter.

## IV

Although we think it clear beyond peradventure that the government waived its good-faith argument by declining—not just "fail[ing]"—to present it to the panel, and that the Court therefore erred (and errs) in considering and deciding that issue *sua sponte*, we will indulge the majority's premise and assume, for the balance of the opinion, that the government's non-argument was the product of mere forfeiture.  For reasons we will explain, though, even on that view, the majority has offered no persuasive justification for insinuating itself into a criminal prosecution to save the United States—the quintessential sophisticated, repeat-player litigant—from what are, at best, its litigation failures.

As already noted, the majority articulates the correct legal standard governing *sua sponte* consideration and decision of a forfeited issue:  In short, a court may do so when "'extraordinary circumstances'" warrant.  Maj. Op. at 20 (quoting *Wood*, 566 U.S. at 471 n.5).  Indeed, the majority repeatedly recites the "extraordinary

---

appropriate circumstances, we routinely hold parties to the concessions that their lawyers make during oral argument.

circumstances" criterion. *See, e.g.*, *id.* at 17, 20, 21, 25, 30, 31, 33, 34, 35, 53. Conspicuously, though, the majority never makes any effort to *apply* that (or any other appropriately stringent) standard. To the contrary, the majority says (citing a law review article for support) that ultimately, "the degree to which we adhere to the prudential practice of forfeiture and the conditions under which we will excuse it are *up to us* as an appellate court." *Id.* at 20 (emphasis added). Seemingly in an effort to operationalize that "up to us" measure, the majority seizes on the five-part test articulated in *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324 (11th Cir. 2004)—which, as we will explain, is derived from, and heretofore has applied in, an altogether different context.

In the sections that follow, we will first engage the majority's *Access Now* analysis and explain why it fails even on its own terms, and then explain why this case doesn't remotely satisfy the "extraordinary circumstances" standard that the Supreme Court has prescribed for forfeiture cases.

## A

At the outset, it's worth reiterating the general rule, which embodies the adversarial system's core tenet and which we have applied even in cases involving inadvertent forfeiture: "Our task in assessing an appeal is to adjudicate the issues that are fairly and plainly presented to us and of which the [opposing party] is put on notice; it is not to hunt for issues that [a party] may or may not have intended to raise." *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). Not surprisingly, "[o]ur cases . . . are

16-10128        NEWSOM and JORDAN, JJ., Dissenting        41

replete with the rule that we do not have a duty to raise and decide issues—even constitutional ones—not mentioned by the parties." *United States v. Haynes*, 762 F.3d 1300, 1310 (11th Cir. 2014). To show just how settled that rule is in this circuit—but mindful of time and space constraints—we cite one case from each of the last eight decades. *See, e.g.*, *Nettles v. Gen. Accident Fire and Life Assurance Corp.*, 234 F.2d 243, 248 (5th Cir. 1956); *Riverside Press, Inc. v. NLRB*, 415 F.2d 281, 284–85 (5th Cir. 1969); *Davis v. Hill Eng'g, Inc.*, 549 F.2d 314, 324 (5th Cir. 1977); *Fed. Sav. & Loan Ins. Corp. v. Haralson*, 813 F.2d 370, 373 n.3 (11th Cir. 1987); *In re Sec. Grp. 1980*, 74 F.3d 1103, 1114 (11th Cir. 1996); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330–31 (11th Cir. 2004); *Univ. of Ala. Bd. of Tr. v. New Life Art*, 683 F.3d 1266, 1280 (11th Cir. 2012); *In re Guillen*, 972 F.3d 1221, 1230 (11th Cir. 2020). Indeed, this rule is so deeply engrained that we apply it even to *pro se* litigants. *See, e.g.*, *Timpson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).

The majority disagrees with none of this. It acknowledges, quite rightly, that "whether sitting as a panel or *en banc*," this Court "may not consider issues forfeited on appeal" in the absence of what it calls a "forfeiture exception[]." Maj. Op. at 16 n.5.[9] The

---

[9] In a footnote, the majority floats the suggestion that perhaps the good-faith exception isn't a separate "issue" all but, rather, "merely another argument for affirming the District Court's denial of the suppression motion [that] has been properly made to the *en banc* Court." Maj. Op. at 16 n.5. Its reason for doing so is clear enough—to leverage the (undisputed) rule that once an issue is properly presented on appeal, a reviewing court is "'not limited to the particular legal theories advanced by the parties, but rather retain[s] the independent

42            NEWSOM and JORDAN, JJ., Dissenting            16-10128

majority contends that it has found such an exception in *Access Now*. Conspicuously, *neither* the panel in its successive opinions *nor* the government in its briefing to us ever even mentioned *Access Now*, let alone featured it as a basis for considering and deciding the good-faith issue *sua sponte*. Be that as it may, today's majority now says that in *Access Now* this Court "identified five situations in which [an appellate court] may exercise [its] discretion to consider a forfeited issue." *Id.* at 20.

---

power to identify and apply the proper construction of governing law.'" *Id.* (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)). The majority ultimately—and quite correctly—abandons its own suggestion in the face of circuit precedent assigning to the government the burden of "'demonstrating that the good faith exception applies'"—and thereby recognizing the good-faith issue's separateness from Fourth Amendment and exclusion issues more generally. *Id.* (quoting *United States v. Morales*, 987 F.3d 966, 974 (2021)). *See also United States v. Ladson*, 774 F.2d 436, 438–41 (11th Cir. 1985) (recognizing that the good-faith exception is waivable).

Chief Judge Pryor similarly, but more broadly, suggests that the government's waiver (or forfeiture, or whatever) of the good-faith issue before the panel is irrelevant now because "the government has properly briefed the good-faith exception to the en banc court." Pryor Concurring Op. at 2. To be clear, though, his position would insulate from en banc review any significant procedural failure that occurred at the panel stage, because the defaulting party would (as the government has here) just take the full court's hint and clean up its mess in the en banc proceeding. In other words, simply by granting en banc rehearing and vacating a panel's opinion, the full court could whitewash the procedural failure and thereby render the very issue that prompted en banc review—here, whether the government's waiver precludes *sua sponte* consideration and decision of the good-faith exception—unreviewable. That can't be right.

Well, sort of.  To be sure, *Access Now* addressed forfeiture—and the circumstances under which an appellate court has the authority to forgive it.  But it dealt with an entirely different kind of forfeiture that arises in an entirely different procedural posture. (Hence, presumably, that decision's total absence from these proceedings—until now.)  In particular, in *Access Now*, we reiterated several conditions under which an appellate court can consider an issue that wasn't raised in the district court and is then squarely presented for the first time on appeal.  *See* 385 F.3d at 1332 (citing, *e.g.*, *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360–61 (11th Cir. 1984)).  It should go without saying, of course, that this case doesn't involve that scenario.  To the contrary, it involves the exact opposite—an appellate court *sua sponte* taking up an issue that *was* raised in the district court but then, conspicuously, *was not* raised on appeal.  The majority never explains why it believes that the *Access Now* regime (with its attendant exceptions) should apply in the very different context in which this case arises.

And in fact, the majority's own analysis shows that there are good reasons to think that it shouldn't.  The majority focuses exclusively—and in just one short paragraph—on the fourth of the five *Access Now* exceptions, which, it says, applies to permit *sua sponte* consideration of a forfeited issue "where the proper resolution of the issue is beyond any doubt."  Maj. Op. at 30.  But the majority's reasoning demonstrates the misfit between *Access Now* and the situation that we confront here.  It's one thing for an

44        NEWSOM and JORDAN, JJ., Dissenting        16-10128

appellate court to decide a legal question whose answer it thinks is clear and that, though forfeited below, has been properly presented on appeal, such that the parties have had an opportunity to address it. It's quite another for an appellate court to decide a legal question *sua sponte*—no matter how clear it thinks the answer—that no party has mentioned and without notice or briefing, as happened here. To be sure, the former scenario involves a certain distortion of the litigation process, in that the appellate court is acting, in essence, as a court of first instance, considering a question that wasn't fully vetted in the district court. But there's no real *fairness* issue—because, at least as matters stand on appeal, everyone knows exactly what issues are on the table and has had the chance to be heard regarding them. But in a case like this one, the non-forfeiting party has *no* reason to think that the forfeited issue is still in the case—and, in fact, every reason to think that it's not. Here, for instance, Campbell had no basis to suspect that the good-faith issue was still "live"—all he knew was that the government had raised the issue before the district court but then, notably, dropped it from its appellate brief.

Even if one were to grant the majority's implicit premise that the same rules that apply to district-court forfeitures should govern abandonments on appeal, its analysis would encounter yet another significant problem—namely, that it altogether ignores our decision in *United States v. Ladson*, 774 F.2d 436 (11th Cir. 1985). In that case, criminal defendants moved to suppress evidence obtained following a warrantless search of their home. *Id.*

16-10128        NEWSOM and JORDAN, JJ., Dissenting        45

at 438.  The government opposed the defendants' motion, but didn't assert the good-faith exception, as initially articulated in *United States v. Leon*, 468 U.S. 897 (1984), which had been decided a month before the suppression hearing.  After the district court granted the defendants' motion to suppress, the government sought reconsideration based on the good-faith exception.  *See* *Ladson*, 774 F.2d at 438.  When the district court refused to reconsider, the government appealed and raised the good-faith exception in its brief to us.  *Id.*  We refused to entertain the good-faith issue, explaining that the government's excuse for not timely asserting the exception in the district court was "too weak" to justify our consideration of it on appeal—in short, because the government had abandoned its good-faith argument.  *See id.* at 441.

The case for considering the good-faith exception was, if anything, stronger in *Ladson* than it is here.  In *Ladson*, the government had tried to raise the exception in the district court, and had then explicitly presented it again on appeal.  Here, the government "conscious[ly]" chose *not* to argue the good-faith exception on appeal even after addressing it in the district court at that court's express direction.  If we declined in *Ladson* to consider a good-faith argument that had been presented in the district court (albeit late) and then squarely presented on appeal, there is no reasoned basis

46          NEWSOM and JORDAN, JJ., Dissenting          16-10128

for raising, considering, and deciding the good-faith issue *sua sponte* in this case.[10]

★  ★  ★

So to be clear, as its lone gateway for reaching the good-faith issue—and again, even on the counterfactual assumption that it was merely forfeited, rather than waived—the Court has settled on the heretofore uncited *Access Now* decision and its fourth exception, applicable to issues whose proper resolution is "beyond any doubt." 385 F.3d at 1332 (quotation marks omitted). But the majority has wrenched *Access Now* and its beyond-any-doubt exception out of their proper context—cases in which a party failed to raise an issue before the district court but then squarely presents it on appeal—and has done so (1) without any explanation whatsoever and (2) in the teeth of preexisting circuit precedent. It's a reach, to say the very least.

---

[10] If the majority means to abrogate *Ladson*, it should say so. But to be clear, *Ladson* is hardly an outlier, so there may be additional owning up to do. We have repeatedly refused to excuse the government's forfeiture of arguments predicated on exceptions to the exclusionary rule. *See, e.g.*, *United States v. Valerio*, 718 F.3d 1321, 1325 n.6 (11th Cir. 2013) (holding that by failing to properly present it, the government abandoned its argument that the "taint of the Fourth Amendment violation ha[d] been sufficiently purged"); *United States v. Thompson*, 710 F.2d 1500, 1503–04 (11th Cir. 1983) (holding that by failing to raise them properly, the government abandoned its arguments under several exclusionary-rule exceptions, including the good-faith exception).

B

In any event, whatever *Access Now*'s proper field of operation, it remains the settled law—acknowledged by the majority—that, ultimately, an appellate court can raise, consider, and decide a forfeited issue *sua sponte* only in "extraordinary" circumstances. Maj. Op. at 17, 20, 21, 23, 25, 30, 33, 34, 35. Both the Supreme Court and this Court have repeatedly so held. *See, e.g.*, *Sineneng-Smith*, 140 S. Ct. at 1581 ("extraordinary circumstances"); *Wood*, 566 U.S. at 471 (same); *Circuitronix, LLC v. Kinwong Elec. (Hong Kong) Co.*, 993 F.3d 1299, 1308 (11th Cir. 2021) ("extraordinary circumstances" (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)); *Moore v. Pederson*, 806 F.3d 1036, 1042 n.8 (11th Cir. 2015) (same); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 n.7 (11th Cir. 2013) (same); *Opis Mgmt. Res., LLC v. Sec'y, Fla. Dep't for Health Care Admin.*, 713 F.3d 1291, 1297 n.7 (11th Cir. 2013) (same); *Bryant*, 575 F.3d at 1308 ("extraordinary circumstance").

Although it recites the "extraordinary circumstances" standard, the majority never makes any meaningful effort to apply it. Indeed, so far as we can tell, the majority never really applies any standard at all. Instead, it says only that it finds it wise to consider the good-faith issue *sua sponte* "[i]n light of" what it calls (1) the exclusionary rule's "policy underpinnings" and (2) "the specific circumstances of this case." Maj. Op. at 31. In the discussion that follows, we will address the majority's stated justifications, explain why they fail even on their own terms, unpack the extraordinary-

circumstances standard that the Supreme Court has adopted to govern *sua sponte* consideration of forfeited issues, and demonstrate that this case doesn't remotely meet that test.

1

In justifying its decision to raise, consider, and decide the good-faith issue *sua sponte*, the majority relies principally on what it calls the "policy underpinnings" of the exclusionary rule and suggests—without coming right out and saying—that courts should feel uniquely empowered to vindicate those "polic[ies]," even if it means forging ahead in the face of a clear forfeiture. *See* Maj. Op. at 31; *see also id.* at 16 ("policy reasons"), 33 ("policy considerations"), 34 ("policy considerations"), 53 ("policy considerations"); *accord, e.g.*, *Campbell*, 970 F.3d at 1358 ("policy considerations"), 1359 ("policy considerations").

The logic underlying the majority's position is easily summarized. First, the exclusionary rule, although commonly associated with the Fourth Amendment, is not a constitutionally mandated remedy but, rather, "'a judicially created means of deterring illegal searches and seizures.'" Maj. Op. at 31 (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998)). Second, the exclusionary rule should be applied only when its deterrent value outweighs the "social costs" that it imposes, including "'in many cases . . . suppress[ing] the truth and set[ting] the criminal loose in the community without punishment.'" *Id.* at 32 (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)). Third, when a police officer doesn't act culpably, but rather acts with an objectively

reasonable good-faith belief that his conduct is lawful—either by virtue of existing Fourth Amendment precedent or otherwise—the exclusionary rule's deterrent value is quite low. *Id.* at 31–32. From those three premises, the majority draws the conclusion that "the exclusionary rule simply cannot 'pay its way'"—and thus shouldn't be applied—where, as here, the government fails to properly assert the good-faith exception in court. *Id.* at 32 (quoting *Leon*, 468 U.S. at 907 n.6). The reason, the majority says, is that the "focus of the exclusionary rule is solely on deterring police misconduct," and there would be "little sense in excluding evidence" where it was the government's lawyers—not the officers themselves—who made a "mistake[]." *Id.* at 33.

There are two key problems. First, and most obviously— and briefly to resist the majority's counterfactual—this simply isn't a case in which the government's lawyers made a "mistake[]." By contrast, as its lawyer conceded at oral argument, the government made a "conscious" decision—having argued the good-faith issue to the district court—to abandon it on appeal. That fact matters, of course, because it fatally undermines the majority primary justi-fication for *sua sponte* consideration and decision of the good-faith issue. Where, as here, the government deliberately chooses not to press an available good-faith argument, then *it* must bear the re-sponsibility for the "social costs" attendant to that choice—includ-ing "set[ting] the criminal loose in the community without punish-ment." *Id.* at 32 (quoting *Davis*, 564 U.S. at 237). To put it bluntly, the government—as represented by politically accountable

executive-branch officials—should have thought about societal costs before it decided to relinquish its good-faith argument.

Second, although the majority purports to hold only, and narrowly, that *sua sponte* consideration and decision of the good-faith issue is proper "in this case," *id.* at 3, 17, 34, there is nothing in its opinion that really engages—let alone limits its application to—the particulars of this dispute. Quite the contrary, the majority says that even "[s]tanding alone," the "policy considerations underlying the exclusionary rule"—which, by definition, exist in every case in which that rule is implicated—"may well be sufficient to justify" a court's decision to "exercise[e its] discretion to excuse the Government's forfeiture" of the good-faith issue. *Id.* at 33. So we should be clear: The majority opinion strongly hints at what is, in effect, a *per se* rule authorizing (and perhaps even requiring?) appellate panels in this circuit to ignore a failure by a governmental entity to argue the good-faith exception and to decide that issue *sua sponte*. It's a bold stroke.[11]

Perhaps sensing an overreach, the majority falls back on a handful of "case specific reasons" for why it "exercise[s its]

---

[11] And to be even clearer, the majority's logic, and thus its authorization—or perhaps injunction—presumably applies not only where, as here, the government is the appellee defending a conviction, but also where it is the appellant challenging a district court's decision to suppress. The majority's you-can't-deter-officers-where-the-government's-lawyer-blundered rationale, *see* Maj. Op. at 31–33, applies equally in both instances.

16-10128        Newsom and Jordan, JJ., Dissenting        51

discretion to" *sua sponte* consider the good-faith exception.  Maj. Op. at 33.  With respect, none holds water.

The majority first invokes the well-established principle that an appellate court "ha[s] 'discretion to affirm on any ground supported by the law and the record that will not expand the relief granted below.'"  *Id.* at 34 (quoting *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1654 (2018)).  To be sure, that principle exists, and to be sure, it is longstanding.  Overwhelmingly, though, the rule applies not where—as here—an appellate court *seeks out* (*i.e.*, "sall[ies] forth" for, *Sineneng-Smith*, 140 S. Ct. at 1579) an alternative basis for affirmance, but rather where the party that prevailed in the district court *presents* an alternative ground and urges the appellate court to adopt it.  Even in that circumstance, the appellate court may well decline the invitation to affirm because the party defending the lower court's judgment failed to adequately present its alternative theory—as, in fact, the Supreme Court did in the very case that the majority cites for the rule.  *See Upper Skagit*, 138 S. Ct. at 1654.

And indeed, we have (to this point) consistently enforced forfeiture rules against appellees who fail to properly present alternative grounds for affirmance.  We recently reiterated, for instance, that "[a]lthough an appellee may urge us to affirm on any basis supported by the record, it still abandons any position that it fails to list or otherwise state . . . as an issue on appeal."  *Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 821 n.4 (11th Cir. 2020) (cleaned up).  Eleventh Circuit decisions to that effect are legion.  *See, e.g., Cote*

*v. Philip Morris USA, Inc.*, 985 F.3d 840, 846 (11th Cir. 2021) (ruling that the appellee abandoned an alternative ground for affirmance by "rais[ing] it only in the Introduction of her brief"); *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1149 n.4 (11th Cir. 2017) (concluding that the appellee (a habeas petitioner) abandoned an argument by failing to raise it in his brief as an alternative ground for affirmance); *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 847 n.4 (11th Cir. 2004) (declining to consider an argument because the appellee "fail[ed] to discuss it in its answer brief"); *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 n.16 (11th Cir. 1995) (observing that the "[a]ppellees' failure to brief this issue abandons it for the purposes of this appeal"); *Johnson v. Wainwright*, 806 F.2d 1479, 1481 n.2 (11th Cir. 1986) (concluding that the appellee (a state in a habeas case) abandoned an exhaustion defense by not raising it on appeal); *Pennington v. Spears*, 779 F.2d 1505, 1506 (11th Cir. 1986) (same).[12]

And to reiterate what we have said before, there are good reasons for requiring appellees (like appellants) to present arguments in support of their positions. Judge Carnes's explanation in *Hamilton*, already noted, bears repeating:

> The requirement that issues be raised in a party's brief on appeal promotes careful and correct decision

---

[12] None of these decisions, or the rule they applied, are anywhere to be found in the majority opinion. If the majority means to have overruled them, it has done so *sub silentio*, without acknowledgment or explanation, and without establishing any meaningful limiting principles.

16-10128        Newsom and Jordan, JJ., Dissenting        53

making. It ensures that the opposing party has an op-
portunity to reflect upon and respond in writing to
the arguments that his adversary is raising. And it
gives the appellate court the benefit of written argu-
ments and provides the court and the parties with an
opportunity to prepare for oral argument with the op-
posing positions and arguments in mind. It is not too
much to ask of an appellant or an appellee.

680 F.3d at 1319. By enforcing this raise-it-or-lose-it requirement,
or at least by applying it rigorously, we ensure that courts don't
"act as a [party]'s lawyer and construct the party's theory of liability
from facts never alleged, alluded to, or mentioned during the liti-
gation." *Fils v. City of Aventura*, 647 F.3d 1272, 1285 (11th Cir.
2011); *see also Tom v. Heckler*, 779 F.2d 1250, 1260 (7th Cir. 1985)
(Posner, J., dissenting) ("[T]he adversarial system is the system we
have, and *ad hoc* modifications which cast an appellate judge . . . in
the role of *juge d'instruction* are unlikely to improve the sys-
tem . . . .").[13]

_____

[13] Although, for present purposes, we are indulging the majority's premise that
the government merely forfeited, rather than waived, the good-faith issue, we
note that the law seems to be settled that the affirm-on-any-basis principle has
no application to cases involving intentional waiver. *See TD Bank N.A. v.
Hill*, 928 F.3d 259, 276 n.9 (3d Cir. 2019) ("[W]e may affirm on any ground
supported by the record as long as the appellee did not *waive*—as opposed to
*forfeit*—the issue."); *LaSalle Nat'l Bank v. Gen. Mills Rest. Corp.*, 854 F.2d
1050, 1052 (7th Cir. 1988) ("[W]e are free to affirm on any ground that is sup-
ported by the record and has not been waived by the appellee.").

As a second "case specific reason[]" for engaging in *sua sponte* decisionmaking, the majority (echoing the panel's revised opinion, *see* 970 F.3d at 1359) emphasizes that because the pertinent facts regarding McCannon's stop of Campbell are undisputed, "the question of whether the good-faith exception applies has become a pure question of law." Maj. Op. at 33, 34. But that's a bootstrap. Even on the majority's own statement of the governing legal principles, in order "[t]o consider an issue abandoned on appeal . . . we must first find that one of our forfeiture exceptions applies and then decide whether the issue is important enough for us to exercise our discretion and excuse the forfeiture"—*i.e.*, whether the requisite "extraordinary circumstances" exist. *Id.* at 24–25. And to be clear, whether or not a question is purely legal has *nothing* to do with the ultimate question whether extraordinary circumstances warrant an exercise of the court's discretion. Rather, it is relevant—if at all—only to the threshold determination whether the court has the power to consider the forfeited issue in the first place.

In *Access Now*—on which, as already explained, the majority relies for its fourth, "beyond any doubt" exception—we noted that an appellate court may, in appropriate circumstances, consider "a pure question of law" that a party failed to properly preserve in district court. 385 F.3d at 1332 (quotation marks omitted). Tellingly, we think, in casting about for a "forfeiture exception[]" that might empower it to consider the good-faith issue *sua sponte* here, the majority makes no effort to rely on *Access Now*'s pure-

16-10128          Newsom and Jordan, JJ., Dissenting          55

question-of-law category. And for good reasons. First, notwithstanding the majority's assertion, it's not at all clear that the good-faith exception's application to a given set of facts presents a purely legal question. *See, e.g.*, *United States v. Riedesel*, 987 F.2d 1383, 1391 (8th Cir. 1993) (holding that the applicability of the good-faith exception presents "a mixed question of law and fact"); *United States v. Brown*, 951 F.2d 999, 1004 (9th Cir. 1991) (same). Second, and separately, *Access Now* authorizes appellate review of a forfeited legal issue *only* where the refusal to consider it would "result in a miscarriage of justice." 385 F.3d at 1332 (quotation marks omitted). Needless to say, the United States won't suffer a "miscarriage of justice" if a single criminal defendant succeeds in having evidence excluded *for what all now agree was a violation of his Fourth Amendment rights.*[14] That fact not only disqualifies the

---

[14] To be clear, we have expressly rejected the suggestion that we must "entertain all issues first raised on appeal [that] are outcome determinative," as such an "approach would swallow our general rule of waiver, further impeding the efficient administration of justice." *First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1061 n.8 (11th Cir. 1990). There is, in short, no all-purpose "ends justify the means" forfeiture exception.

Our decision in *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338 (11th Cir 2017), illustrates the miscarriage-of-justice criterion's application—and its limitations. In that case, a former employee argued for the first time on appeal that the district court had erred by compelling arbitration of his claims against his one-time employer four years into the litigation. *See id.* at 1352. We declined to consider the argument, holding that because the former employee had "ample opportunity" to present the arbitrability issue to the district court, he would suffer no "miscarriage of justice" if we declined to address it. *Id.* Like the employee in *P.J. Cheese*, the government here knew about its good-

good-faith issue in this case for *Access Now* treatment—as the majority seems to recognize, by declining to invoke that decision's pure-question-of-law criterion—but also undermines any serious contention that "extraordinary circumstances" warrant *sua sponte* decisionmaking here.

To be clear, having properly sworn off any consideration of the good-faith issue's (allegedly) "purely legal" status in making the threshold determination whether any "forfeiture exception" authorizes *sua sponte* decisionmaking, the majority cannot then smuggle it back into the calculus as part of the back-end extraordinary-circumstances determination. Maj. Op. at 31. And in any event, even if good faith *were* a "pure question of law," such that it might readily lend itself to decision on appeal, *id.* at 34, that would say nothing about whether the requisite extraordinary circumstances exist.

Finally, the majority says that "[e]xercising [its] discretion" to consider and decide the good-faith issue *sua sponte* is "appropriate" because "even though neither he nor the Government directly addressed the issue," Campbell's arguments to the panel "logically implicate[d]" McCannon's good faith. *Id.* at 34–35. The majority's position is difficult to discern. As the majority itself ultimately acknowledges, the government "'bears the burden of

---

faith argument—having raised it in the district court—and had "ample opportunity" to present it on appeal. So, also like the employee, the government is simply a victim of its own litigation choices.

16-10128        NEWSOM and JORDAN, JJ., Dissenting        57

demonstrating that the good faith exception applies.'" *Id.* at 16 n.5 (quoting *United States v. Morales*, 987 F.3d 966, 974 (11th Cir.), *cert. denied* 142 S. Ct. 500 (2021)).[15]  What that means, of course, is (1) that the government—alone—had the "duty or responsibility" to demonstrate the exception's applicability, *Burden*, Black's Law Dictionary (11th ed. 2019), and (2) that when the government failed to do so, it lost that issue, *see United States v. Mancilla-Ibarra*, 947 F.3d 1343, 1352 (11th Cir. 2020).  As Judge Silberman pointedly asked in an analogous situation, "[h]ow can the government discharge its burden when it fails to mention the issue at all?" *Pryce*, 938 F.2d at 1354 (Silberman, J., dissenting in part).  Simple:  It can't.

---

[15] *Accord, e.g.*, *United States v. Bershchansky*, 788 F.3d 102, 113 (2d Cir. 2015) ("The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant." (quotation marks omitted)); *United States v. Wurie*, 728 F.3d 1, 13 (1st Cir. 2013) ("The government bears the 'heavy burden' of proving that the good-faith exception applies . . . ."); *United States v. Ellis*, 330 F.3d 677, 679 (5th Cir. 2003) ("It is [the defendant's] burden to prove a Fourth Amendment violation, but once he does so, the burden shifts to the government to demonstrate why evidence obtained in an illegal search or seizure should not be excluded."); *United States v. Corral-Corral*, 899 F.2d 927, 932 (10th Cir. 1990) ("[T]he government, not the defendant, bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable." (quotation marks omitted)); *United States v. Michaelian*, 803 F.2d 1042, 1048 (9th Cir. 1986) (holding that "[t]he government, not the defendant, bears the burden of proving" the good-faith exception's applicability); *see also, e.g.*, LaFave *et al.*, *Criminal Procedure* § 10.3(b) (noting that the "burden is on the prosecution" to establish the good-faith exception's applicability).

Accordingly, the majority's suggestion to the contrary notwithstanding, Campbell had no obligation—none—to "address[] the issue" of McCannon's good faith, either "directly" or otherwise. *Contra* Maj. Op. at 35. To the contrary, as already explained, when the government, having argued good faith in the district court, opted not to renew its good-faith argument on appeal, Campbell had every reason—and every right—to conclude that the issue had dropped out of the case. He was entitled to make his merits arguments without worrying that he was somehow relieving the government of its burden to prove good faith or, worse, opening himself up to a surprise *sua sponte* ruling on appeal.

★  ★  ★

In sum, none of the majority's scattershot justifications for raising and deciding the good-faith issue *sua sponte*—whether grounded in "policy considerations" or the idiosyncrasies of this case—withstands careful scrutiny. And in any event, none stands in for—let alone constitutes—the sort of "extraordinary circumstances" that Supreme Court precedent demands. We turn, in closing, to the exceptional-circumstances issue.

## 2

Not only has the majority failed to articulate or apply any standard of its own, but it has also—even while mouthing the words—completely failed to come to grips with the "extraordinary circumstances" standard that the Supreme Court has prescribed for

forfeiture situations like the one that (on the majority's premise) this case presents. Let's explore.

As already noted, the Court in *Sineneng-Smith* recently reaffirmed the longstanding principle that, "as a general rule, our system 'is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument[s] entitling them to relief.'" 140 S. Ct. at 1579 (cleaned up) (quoting *Castro*, 540 U.S. at 386 (Scalia, J., concurring in part and concurring in the judgment)). Emphasizing the courts' traditional role as "passive instruments of government" and neutral arbiters in an adversarial system, the Supreme Court explained: "They 'do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties.'" *Id.* (alterations adopted) (quoting *Samuels*, 808 F.2d at 1301 (Arnold, J., concurring in denial of rehearing en banc)).

Although the *Sineneng-Smith* Court acknowledged that "[t]he party presentation principle is . . . not ironclad" and that an appellate court may at times assume a "modest initiating role," it flatly rejected the Ninth Circuit's *sua sponte* "takeover" of a criminal appeal, which it had decided on grounds not presented by the parties. *Id.* at 1581. In particular, the court of appeals had largely ignored the statutory and constitutional grounds on which a criminal defendant had challenged her conviction, appointed several amici curiae to brief a new issue, authorized the parties to file

60          Newsom and Jordan, JJ., Dissenting          16-10128

supplemental responses, and ultimately adopted one of the amici's contentions as the basis for its holding. *See id.* at 1580. In reversing, the Supreme Court held, in short, that "[n]o extraordinary circumstances" justified the Ninth Circuit's non-"passive," non-"modest" assertion of judicial power. *Id.* at 1581. Accordingly, the Court remanded for the case to be decided in a manner "bearing a fair resemblance to the case shaped by the parties." *Id.* at 1582.

While the majority here briefly nods in *Sineneng-Smith*'s direction, *see* Maj. Op. at 18–19, it never really grapples with what the Supreme Court said or did there.[16] But *Sineneng-Smith* isn't so

_____

[16] For its part, in its brief to us the government suggested—without coming right out and saying—that *Sineneng-Smith* should be limited to circumstances in which an appellate court reverses, rather than affirms, a district court's judgment. *See* En Banc Br. of the United States at 24–26. In that respect, the argument seems to go, the situation that the Supreme Court confronted in *Sineneng-Smith* was "worse" (our word) than what occurred here. The majority also appears to embrace some version of the reversal-affirmance distinction. *See* Maj. Op. at 33 ("We are loath to reverse the District Court simply because the Government failed to adequately defend the Court's ultimately correct judgment."). Two responses: First, nothing in the Supreme Court's opinion suggests that its decision turned on that distinction. To the contrary, all of the Court's language—about the virtues of the "adversarial system" and "party presentation," about appellate courts being "neutral," "passive" and "modest," etc.—applies here, as well. Second, in one very important respect— about which we'll have more to say shortly—the manner in which the panel here engaged the unargued issue was demonstrably worse than the Ninth Circuit's "takeover" in *Sineneng-Smith*. At least the Ninth Circuit notified the parties of the new issue that it wanted explored and gave them an opportunity to be heard. Here, by contrast, the panel never said *anything* about the good-faith exception—not in questions at oral argument, not in a request for

16-10128        Newsom and Jordan, JJ., Dissenting        61

easily shrugged off, as it—and in particular its extraordinary-circumstances standard—follows closely from the Supreme Court's earlier decisions (already discussed) in *Granberry*, *Day*, and *Wood*, which sharply circumscribed federal courts' authority in habeas cases to *sua sponte* consider alternative grounds for affirmance that a state has failed to properly present.  As relevant here, the Court in *Wood* repeated its earlier holdings in *Granberry* and *Day*, respectively, that federal courts "have discretion, in '*exceptional cases*,' to consider" arguments that the state has "'inadverten[tly] overlooked,'" *Wood*, 566 U.S. at 471 (emphasis added) (quoting *Granberry*, 481 U.S. at 132, 134), and that they retain "authority to consider a forfeited . . . defense when *extraordinary circumstances* so warrant," *id.* (emphasis added) (citing *Day*, 547 U.S. at 201).[17]

---

supplemental briefing, not ever—until it issued its opinion.  Thus, whereas the Ninth Circuit in *Sineneng-Smith* merely *raised* an issue *sua sponte*, the panel here went one step further and *decided* the good-faith issue *sua sponte*—and did so without any notice to the parties whatsoever.

[17] *Cf. also, e.g.*, *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) ("[T]his Court will affirm on grounds that have not been raised below only in exceptional cases." (cleaned up)); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 39 (1989) ("Although we could consider grounds supporting the judgment different from those on which the Court of Appeals rested its decision, where the ground presented here has not been raised below we exercise this authority only in exceptional cases." (cleaned up)); *Heckler v. Campbell*, 461 U.S. 458, 468 n.12 (1983) (acknowledging the Court's authority to "consider grounds supporting [respondent's] judgment different from those on which the Court of Appeals rested its decision," but opting not to exercise that authority because the case before it was not "exceptional"); *Youakim v. Miller*, 425 U.S. 231, 234 (1976) (per curiam) ("It is only in exceptional cases coming here from

The majority's refusal to meaningfully engage *Sineneng-Smith* is regrettable but, in a way, understandable. As explained below, the case for allowing *sua sponte* consideration and decision of the government's good-faith argument here is spectacularly weak, and it fails any appropriately stringent standard. Put simply, no "extraordinary"—*i.e.*, "exceptional," "unusual," or "singular"[18]—circumstances justify the Court's decision of Campbell's appeal on a ground that the government failed (or refused) to raise before the panel. Quite the contrary, in fact.

a

Consider first the *party* that the Court's *sua sponte* decisionmaking aids—the United States of America. The United States, which is represented in court by the U.S. Department of Justice, is the quintessential sophisticated, repeat-player litigant. Here's what the Supreme Court said about the United States, vis-à-vis the party-presentation principle, in a case that asked whether a court of appeals could *sua sponte* increase an appealing defendant's sentence even absent a cross-appeal by the government arguing that the sentence was too low: "Counsel almost always know a great deal more about their cases than we do, *and this must be particularly true of counsel for the United States, the richest, most powerful,*

---

the federal courts that questions not pressed or passed upon below are reviewed." (quotation marks omitted)); *Duignan v. United States*, 274 U.S. 195, 200 (1927) (same).

[18] *Extraordinary*, Oxford English Dictionary (online ed.).

16-10128        NEWSOM and JORDAN, JJ., Dissenting        63

and best represented litigant to appear before us." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quoting *Samuels*, 808 F.2d at 1301 (Arnold, J., concurring in denial of rehearing en banc) (emphasis added)).

As already explained, one of the issue-creation advocates' chief justifications for allowing courts to consider and decide issues *sua sponte* is to "ameliorate the imbalances" that they contend can occur "[w]hen the resources and abilities of opposing parties are lopsided" and which, they say, can "undermine the adversarial system['s]" goal of "produc[ing] accurate results." Frost, *Limits of Advocacy*, at 500–01. Here, that justification is 180 degrees off-point. With all due respect to Campbell's very capable public defenders—who have acquitted themselves well here—no one would contend that their "resources and abilities" so far outstrip DOJ's that the government needed an assist from this Court.

Intervening to aid the government in the course of a criminal prosecution also implicates separation-of-powers concerns—arguably in two respects. As Judge Silberman has explained, if "the government refuses to argue" an alternative basis for affirming a criminal conviction on appeal—even, he said, where its failure to do so is "inexplicable" and results from an "obvious mistake"—a court considering the unargued issue *sua sponte* both (1) puts "the judiciary's neutrality at issue" and (2) risks "encroaching into the executive branch's prosecutorial prerogatives." *Pryce*, 938 F.2d at 1352–54 (Silberman, J., dissenting in part). Although "[t]he core of prosecutorial discretion []—its essence—is the decision whether or

not to charge an individual with a criminal offense in the first place," the term also comprises, more generally, "the soup-to-nuts entirety of '[a] prosecutor's power to choose from the options available in a criminal case.'" *In re Wild*, 994 F.3d 1244, 1260 (11th Cir. 2021) (en banc) (quoting *Prosecutorial Discretion*, Black's Law Dictionary (10th ed. 2014)), *petition for cert. filed* (U.S. Aug. 31, 2021) (No. 21-351). And while those "options" most obviously include, for instance, decisions about plea bargaining and sentencing, *see id.*, the concept of prosecutorial discretion is clearly broad enough to cover the appellate phase of a criminal case. *Cf. Greenlaw*, 554 U.S. at 246 (noting, and bracketing, the Solicitor General's contention that the same sort of "authority and discretion" that underlie charging decisions "are lodged in the Executive Branch with respect to the pursuit of issues on appeal").

## b

Next, consider the nature of the *issue* that the Court here opted to consider and decide notwithstanding the government's non-argument. In at least two respects, the good-faith question is a uniquely poor candidate for *sua sponte* decisionmaking.

The first, we have already covered: The "government bears the burden of demonstrating that the good faith exception applies." *Morales*, 987 F.3d at 974; *see also supra* at 56–57. Surely that must mean, at the very least, that it has *some* obligation to make an affirmative case for its application. *See Pryce*, 938 F.2d at 1354 (Silberman, J., dissenting in part).

16-10128        NEWSOM and JORDAN, JJ., Dissenting        65

Second, recall that one of the key factors that issue-creation advocates cite to justify *sua sponte* decisionmaking is the need to protect courts' ability to make accurate pronouncements of law that will establish "precedent that binds future litigants." Frost, *Limits of Advocacy*, at 453. Because of that feature of the "common law system," they insist, "courts cannot cede to the parties control over legal analysis." *Id.* But that concern is at its lowest conceivable ebb in a case like this, in which the application of the good-faith exception is utterly fact-bound: Did *this* officer, in *these* circumstances, reasonably rely on a *particular* (and since-abrogated) case? Needless to say, this Court's answer to that question is—in the majority's own words—inherently "case specific," Maj. Op. at 33, and, for better or worse, won't clarify the law (or bind any future litigants) going forward.

c

Finally, consider the *process* by which the good-faith issue was raised, considered, and decided in this case. Again, two things stand out, both of which undermine the majority's position. First, the parties addressed the good-faith issue in the district court—indeed, they did so at that court's express direction. Unsurprisingly, Campbell argued (1) that in conducting the traffic stop McCannon violated the Fourth Amendment and (2) that "the good faith exception . . . does not apply in this case." Def.'s Second Supp. Mot. to Suppress at 1. For its part, and equally unsurprisingly—and more to the point for present purposes—the government argued (1) that McCannon's stop "did not violate Campbell's Fourth Amendment

rights" and (2) that, in any event, "the Court should apply the good-faith exception." Gov't's Supp. Opp. to Def.'s Mot. to Suppress at 6; *see also id.* at 10–12 (elaborating on its position that the good-faith exception applied). As the majority explains, because the district court concluded—erroneously, as it turns out—that McCannon's seizure didn't violate the Fourth Amendment, it had no reason to decide "whether—as the Government argued in its supplemental briefing—the good-faith exception to the exclusionary rule applied." Maj. Op. at 14.

The rest, of course, is history: The panel held that, in fact, McCannon's conduct *did* violate Campbell's Fourth Amendment rights but—despite the government's failure (refusal) to renew its good-faith argument—that the good-faith exception to the exclusionary rule applied. *See Campbell*, 912 F.3d at 1355–56, *as amended*, 970 F.3d at 1356–58. Echoing the panel's revised opinion, *see* 970 F.3d at 1360, the majority here seems to count it as a factor in favor of deciding good faith *sua sponte* that "the parties both fully briefed the good-faith exception before the District Court." Maj. Op. at 25 n.10. To the contrary, the fact that the government argued the good-faith exception in the district court and then, in response to Campbell's opening brief in this Court, *opted not to*, makes deciding the issue *sua sponte* more unreasonable, not less. Surely, given the case's history in the district court, Campbell reasonably deduced from the government's appellate brief, which included nary a word about the good-faith exception, that the government had decided—for whatever reason—to leave

16-10128        NEWSOM and JORDAN, JJ., Dissenting            67

that issue aside and focus exclusively on the merits of the Fourth Amendment question. So, not surprisingly, when he filed his reply brief before the panel, Campbell didn't address good faith either. Then, out of the blue, and without warning, the panel decided the case against him on that very ground. It must have been quite the shock.

Which leads to a second process-based problem. Not only did the panel decide the good-faith issue in the conspicuous absence of any written or oral argument from the government, but it did so without any notice to the parties whatsoever. No good-faith-related questions at oral argument, no request for supplemental briefing, no nothing. Contrast what the Supreme Court said in *Day* about the narrow circumstances in which a federal court may *sua sponte* consider and decide a case-dispositive issue. To repeat briefly, the Court emphasized—and again, even in the habeas context—that it would be "an abuse of discretion to override a State's deliberate waiver" of a potentially winning argument. 547 U.S. at 202. More importantly for present purposes—while we are assuming, counterfactually, that all the government did here was inadvertently *forfeit* its good-faith argument—the Court said this: "Of course, before acting on its own initiative" to decide a forfeited issue, "a court *must* accord the parties fair notice and an opportunity to present their positions." *Id.* at 210 (emphasis added). That injunction—and the fairness considerations that it embodies—was not obeyed here.

★   ★   ★

68          Newsom and Jordan, JJ., Dissenting          16-10128

For all of these reasons, and even setting aside what is to us the obvious fact that the government here deliberately waived—rather than inadvertently forfeited—its good-faith argument, there simply was (and remains) no strong case for raising, considering, and deciding that issue *sua sponte*. In nonetheless bulling ahead to do so—for vaguely defined "policy" and "case-specific" reasons—the Court has impermissibly exercised whatever discretion it might have by acting in the absence of anything approaching "extraordinary circumstances."[19]

V

There is a certain irony in the fact that we are here debating the propriety of a court's *sua sponte* invocation and application of the good-faith exception to the exclusionary rule in a Fourth Amendment case. The irony results from the fact that one of the

---

[19] Before we conclude, a final response to Chief Judge Pryor's concurrence. The Chief highlights the facts attendant to Campbell's stop and detention—that McCannon found incriminating evidence in Campbell's car and inferred on the basis of that evidence that Campbell might be an armed robber, that Campbell had a prior armed-robbery conviction, etc.—and reassures us that "the result of this appeal is just" inasmuch as "[a] criminal will receive the punishment that the district court decided he deserves" without intervention by this Court. Pryor Concurring Op. at 1, 5–6. Two problems: First, let us not forget that "the district court decided," *id.* at 1, Campbell's fate based on what *all now agree* was an error of law—namely, that McCannon's stop comported with the Fourth Amendment. *See supra* at 3. Second, and in any event, our job is to apply the law, not to do "just[ice]," and preserving one conviction isn't worth distorting the adversarial process beyond recognition. Pryor Concurring Op. at 1.

16-10128        Newsom and Jordan, JJ., Dissenting        69

most notable exclusionary-rule decisions in Supreme Court history, *Mapp v. Ohio*, 367 U.S. 643 (1961), likewise resulted from an exercise of *sua sponte* decisionmaking. There, the Court overruled its earlier decision in *Wolf v. Colorado*, 338 U.S. 25 (1949), and extended the exclusionary rule to the states—even though no party had asked it to do so.

To be sure, the consequences of today's decision for Fourth Amendment law pale in comparison to *Mapp*'s. *Mapp* revolutionized constitutional criminal procedure as we know it. In stark contrast, for Fourth Amendment purposes, our decision in this case—applying the good-faith exception to permit the admission of evidence found in a roadside search of a single individual's car on the ground that the responding officers reasonably relied on since-abrogated caselaw—is, for all intents and purposes, a one-off unicorn. But from an appellate-procedure standpoint, the decision in this case shares important similarities with *Mapp*—most notably the fact that in both cases, appellate courts sidestepped the usual rules of adversarial procedure to consider and decide issues that no party had put before them.

In dissenting from the Supreme Court's decision in *Mapp*, Justice Harlan (joined by Justices Frankfurter and Whittaker) objected that the exclusionary-rule issue was not "the principal issue which was decided by [the lower court], which was tendered by appellant's Jurisdictional Statement, [or] which was briefed and argued in" the Supreme Court. 367 U.S. at 673 (Harlan, J., dissenting). Indeed, he said, the Court had taken the liberty of extending

the exclusionary rule to state prosecutions "in the context of a case where the question was briefed not at all and argued only extremely tangentially." *Id.* at 676. "In th[at] posture of things," Justice Harlan thought it "fair to say" that the Court "ha[d] simply 'reached out'" to decide the issue. *Id.* at 674.

So too here, perhaps doubly so. First, even on the majority's own terms—even, that is, assuming that all the government did here was "unwittingly" *forfeit* its good-faith-exception position—there was no basis for the panel to raise, consider, and decide the good-faith issue *sua sponte* and without notifying the parties or giving them any opportunity to address the issue. Second, and far worse, it now seems clear—in the light of important concessions during en banc proceedings—that the Court has overridden the government's deliberate *waiver* of its good-faith argument. By doing so, the Court has not only violated ordinary principles of notice, party presentation, and adversary procedure, but has also cast itself in the role of advocate and, at least arguably, interfered with the executive branch's judgments about how best to frame its litigation strategy and thus transgressed the separation of powers.

We cannot agree, and therefore respectfully dissent.